**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| **UNITED STATES of AMERICA, *ex rel.*** **JESSICA KIETZMAN** | ) |
| **Plaintiff,** | ) |
| **v.** | ) **CAUSE NO: 4:16-cv-00009-SEB-DML** |
| **THE BETHANY CIRCLE OF KING'S DAUGHTERS' OF MADISON, INDIANA, INC. d/b/a The King's Daughters' Hospital and Health Services** | ) |
| **Defendant.** | ) |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Jessica Kietzman, (hereinafter "Mrs. Kietzman"), by counsel, on behalf of herself and the Government of the United States of America, for their causes of action against Defendant, The Bethany Circle of King's Daughters' of Madison, Indiana, Inc. d/b/a The King's Daughters' Hospital and Health Services (hereinafter "KDHS"), alleges and states as follows:

## I. NATURE OF COMPLAINT

1. This *qui' tam* action is brought against KDHS for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.,* and for retaliation and retaliatory discharge related thereto pursuant to 31 U.S.C. § 3730(h).

## II. PARTIES

2. Mrs. Kietzman brings this action under 31 U.S.C. § 3730(b) on behalf of the Government of the United States of America, and on her own behalf insofar as the violations of 31 U.S.C. § 3730(h) are concerned.

3. Defendant is a corporation that maintains offices and conducts business within the geographic boundaries of the Southern District of Indiana, and elsewhere.

4. Mrs. Kietzman is a resident of the State of Indiana, who at all times relevant resided within the geographic boundaries of the Southern District of Indiana.

## III. Jurisdiction and Venue

5. Jurisdiction is conferred on this court by 28 U.S.C. §1331; 28 U.S.C. §1367; and 31 U.S.C. § 3732(a).

6. Kietzman's state law claim is so related to her federal law claims that all of the claims form a single case and controversy under Article III of the United States Constitution.

7. The events, transactions, and occurrences relevant to this lawsuit have arisen within the geographical environs of the Southern District of Indiana and this division, and therefore venue is proper in this Court and this division.

## IV. Factual Allegations

### Background on KDHS Personnel referenced in this Complaint

8. Defendant hired Mrs. Kietzman in or about 1999 as a unit secretary; she was promoted to a nurse intern in 1999, and later to a staff nurse in 1999, was promoted to a charge nurse in 2000, and was promoted to nursing supervisor in 2004. Since 2007, she was promoted to, and has served as the Oncology Service Line Director, supervising and directing the Cancer Center at KDHS ("Cancer Center"). From 2007 through 2009, Mrs. Kietzman was also the Women's Service Line Director at KDHS (i.e. covered OB/Gyn, and women's care). Mrs. Kietzman is a licensed registered nurse within the State of Indiana. Mrs. Kietzman held the position of Director of the Cancer Center until her termination from employment by Defendant on or about October 5, 2015. From her initial hire date, up to the point in time of her

termination, Mrs. Kietzman received exemplary employee reviews during her employment at KDHS, and had never been subjected to any discipline. Mrs. Kietzman's job duties did not involve compliance related activities or fraud detection.

9. For the ease of the Court in identifying the various persons and parties in this Complaint, Mrs. Kietzman reported, from at least January 1, 2014 through October 5, 2015, to Lisa Morgan, V.P. of Patient Services for KDHS ("Mrs. Morgan"). Mrs. Morgan served in this position from at least January 1, 2010 to the present.

10. From at least January 1, 2014, through October 30, 2015, Lisa Morgan, in turn, reported to Carol Dozier, the CEO of KDHS ("Mrs. Dozier"). Mrs. Dozier has served in this position since July, 2013.

11. From at least January 1, 2014 through October 30, 2015, Rhonda Gosman ("Ms. Gosman") was a charge master specialist at KDHS (i.e. she is responsible for setting charges and billing and coding and certain auditing functions within KDHS), and reported to Joy Yager (the revenue cycle director) ("Ms. Yager"), who in turn reported to Steve Meacham ("Mr. Meacham"), the KDHS CFO. Mr. Meacham reported to Mrs. Dozier until approximately December, 2015.

12. From at least 2008 through October 5, 2015, Bree Heinz ("Ms. Heinz") was a radiation therapist in the Cancer Center, who reported to Mrs. Kietzman.

13. From at least January 1, 2006 through October 30, 2015, Elizabeth Meyer ("Mrs. Meyer") was a physicist in the Cancer Center, was an independent contractor, and, from 2007 until October 5, 2015 she reported to Mrs. Kietzman.

14. Gina Everett ("Ms. Everett") was a certified medical dosimetrist in the Cancer Center, who reported to Mrs. Kietzman from at least 2008 through October 5, 2015.

15. From at least January 1, 2014 through October 30, 2015, Margie Combs ("Mrs. Combs") was the Director of Risk Management, Patient Safety and Compliance, who reported to Mr. Meacham and later Mrs. Dozier.

16. From at least January 1, 2014 through October 30, 2015, Missy Distel ("Mrs. Distel") was the Director of the KDHS Medical Office Building, which was the location of the physician offices and practices for KDHS; she reported to Denine Hallgarth ("Ms. Hallgarth"), who in turn reported to Mrs. Dozier.

17. From at least January 1, 2014 through October 30, 2015, Kim True ("Ms. True") was Nuclear Medicine Technologist and picture archiving and communication system ("PACS") Administrator. She reported to Joe Purvis, the Medical Imaging Director; Purvis in turn reported to Amy Kasper, the Director of Medical Imaging; Kasper in turn reported to Mrs. Dozier.

18. From at least January 1, 2014 through October 30, 2015, Donna Higginbotham ("Mrs. Higginbotham") was a Healthcare Information and Management Systems ("HIMS") Coder for KDHS. She reported to Linda Darnell, the Interim Director for Medical Records and Information Technology Director, who in turn reported to Steve Meacham, the CEO.

## FACTUAL ALLEGATIONS FOR THIS COMPLAINT

19. Current Procedural Terminology ("CPT") medical code sets are maintained by the American Medical Association through the CPT Editorial Panel. The CPT code set describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes. The CPT code identifies the services rendered rather than the diagnosis on the claim. CPT codes are identified and utilized by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that

handles claims for payment for hospital and medical services to patients for payment by the United States government.

20. When a Medicare claim is submitted, it processes through a series of edits in the Fiscal Intermediary Standard System to ensure that the information provided is complete and correct. If the claim is deemed incomplete or incorrect, it is sent to a return to provider ("RTP") file. In connection with each claim submitted to Medicare and the United States for payment, a provider, such as KDHS, is required to, and does, make certain certifications, including certifications that the procedure in question was in compliance with CMS rules, regulations, and guidelines. Absent such certifications, the payments are not processed and made.

21. According to CMS, physicians must adequately document the treatment of patients in order to receive Medicare reimbursement for treatment provided.

22. Since at least January 19, 2010, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. These radiologists are not employees of KDHS, but are instead independent contractors with privileges at KDHS, who, among other things, are compensated by KDHS, at least in part on the number of procedures ordered and performed.[1]

23. On February 23, 2015, the Cancer Center moved to a new facility. Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. Since at least January 19, 2010, KDHS radiologists would then conduct second full diagnostic read for radiation treatment

[1] The radiologists involved in these procedures, and in the fraud alleged in this Second Amended Complaint, include, but are not limited to, Ross Shiels, M.D., William Porter, M.D., Shawn Glisson, M.D., George Goldsmith, M.D., Michael Schmidt, M.D., and William Skiles, M.D.

planning ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary.

24. Since at least January 19, 2010, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads per year; and a significant percentage of these patients were Medicare/Medicaid patients. As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans.

25. The United States would not have paid these claims for unnecessary radiology reads, had it known that such procedures were unnecessary. The false certifications and false submissions by KDHS, directly, or through authorized agents, contractors, or others, were material to the United States.

26. As explained in greater detail in this Second Amended Complaint, Defendant KDHS knowingly presented, or caused to be presented, to the United States numerous false claims for payment, for each of these improper and unnecessary radiology reads, from January 19, 2010 to the present, as a means of illegally increasing the revenue of KDHS and the revenue of the independent contractor radiologists.

27. The impropriety and illegality of these submittals was known to Lisa Morgan, and others, from January 2010 to the present, and was known by Carol Dozier from at least July, 2013, to the present.

28. On or about August 1, 2014 (or within the few days preceding that date), Ms. Combs sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they billed CMS for the second scan. Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several other risk hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. Prior to this electronic mail, Mrs. Kietzman was not aware and had no reason to be aware that KDHS was actually billing or submitting claims for payment from these second scans; Mrs. Kietzman was not, as a consequence of her job duties, involved with the billing and CMS compliance issues.

29. Upon information and belief, Mrs. Dozier and Mrs. Morgan prompted Ms. Combs to send this e-mail, aware of the illegal and fraudulent billing practices since at least 2010 and 2013, respectively, and desiring to provide "cover" to KDHS for these practices by looking to see if any other hospitals in Indiana were utilizing similar illegal billing practices.

30. On or about October 2, 2014, Mrs. Everett sent an email to Mrs. Dozier, Mrs. Kietzman, and other representatives of the Cancer Center proposing that the Cancer Center utilize a particular CPT code for treatment planning in order to help support the issue of the radiologists not reading the treatment planning CT scans.

31. On or about January 27, 2015, Mrs. Gosman advised Ms. Heinz, that the Cancer Center should no longer bill for productivity. She further requested that Ms. Heinz find another way to report productivity using a different method.

32. Ms. Heinz announced, on or about January 28, 2015, that the Cancer Center would no longer charge for the initial setup on intensity modulated radiation treatment ("IMRT") patients as it was bundled with the IMRT charge.

33. On or about January 29, 2015, Mrs. Morgan advised Mrs. Kietzman that they were still trying to "iron out the treatment planning for CT reads."

34. Later that day, Mrs. Dozier advised the Cancer Center staff, including Mrs. Kietzman, that its physicians and radiologists were going to continue to bill for full diagnostic reads for RadPlanning. This was done despite the August, 2014 e-mail from Ms. Combs, and the response from other hospitals that such procedures were illegal and improper. This was done because Mrs. Dozier was fully aware of the illegal billing practices since at least July, 2013, and desired to continue to illegally maximize the profits of the hospital and its independent contractor radiologists, even though the practice was illegal.

35. Had the United States known of the KDHS actual practices related to RadPlanning, which was material, the United States would not have paid claims for the fraudulent claims.

36. On or about the week of January 19, 2015 through January 23, 2015, outside contractor trainers from Siemens USA, with whom KDHS purchased CT scanning equipment, were onsite at KDHS to conduct training. Thereafter, they were onsite to conduct hands-on training with patients the week of February 9, through February 13, 2015. During this second period they were onsite, the Siemens USA trainers questioned the KDHS protocols, and specifically, the medical imaging diagnostic reads for any scans that followed the IDS. Mrs. Meyer was in the room, heard these conversations, and indicated that it was inappropriate and illegal. She further stated that she would turn KDHS into the United States Government, for fraudulent billing, if this practice did not immediately stop.

37. On or about February 4, 2015, Mrs. Dozier elected to keep the RTP readings by the radiologists the same within the Cancer Center.

38. On February 12, 2015, Jo Purvis informed Mrs. Kietzman via e-mail about Mrs. Meyer's "inappropriate" comments about the fraudulent billing. She copied Mrs. Dozier and Susan Poling, the Human Resources Director on that e-mail.

39. Following the Purvis email, Mrs. Morgan approached Mrs. Kietzman, and confirmed Mrs. Meyer's comments about the fraudulent billing, and advised that Mrs. Dozier intended to terminate Mrs. Meyer's employment as a result of the comments.

40. Mrs. Kietzman indicated to Mrs. Morgan that it was inappropriate to react to Ms. Meyer's statements about turning KDHS into the United States by terminating Mrs. Meyer, and furthermore would be detrimental to the Cancer Center to terminate Mrs. Meyer's employment. As such, Mrs. Kietzman requested to join Mrs. Meyer in a meeting with Mrs. Morgan and Mrs. Dozier.

41. This meeting occurred on February 15, 2015, in which a detailed discussion occurred about radiation treatment planning CT, documentation, billing and charges. Mrs. Dozier told Mrs. Meyer that her comments were inappropriate, and that she would not tolerate anyone who threatened to report any of KDHS' practices to the federal government, nor would she permit anyone who did so to remain employed by KDHS.

42. In an effort to keep her employment, Mrs. Meyer apologized for making the comments to Mrs. Dozier and Mrs. Morgan. Mrs. Kietzman again reiterated that Mrs. Meyer should not be terminated. At that same meeting, Mrs. Dozier indicated that the KDHS process of the radiologists conducting and reading the follow up scans was for "best patient care," but that KDHS did not bill for it. While Mrs. Kietzman and Mrs. Meyer were unaware at the time, this statement by Mrs. Dozier concerning the follow up radiology readings was a knowing, intentional lie designed to deflect attention from the ongoing fraudulent scheme being

perpetrated by KDHS, Mrs. Dozier, and Mrs. Morgan against the United States Government and others.

43. On or about February 18, 2015, after the billing mandate by Mrs. Dozier on the billing for review of CT scans, Ms. Heinz advised Mrs. Kietzman that additional charges should not be entered according to the code book. The code book is a reference manual, or more specifically a series of manuals, published by the Federal Government and CMS, which outlines and provides policies and procedures for medical coding for payment by the United States Government. Among other things, it outlines when charges are, and are not, appropriate. Ms. Heinz's statement to Mrs. Kietzman was intended to alert her to the fact that the directive from Mrs. Dozier was illegal.

44. Sometime in early 2015, Mrs. Kietzman discovered and reported to Mrs. Dozier that the medical oncologist was not adequately documenting his treatment, assessment, and physicians' orders concerning patients in accordance with CMS.

45. Mrs. Dozier requested that Mrs. Kietzman get documentation of the medical oncologist's poor documentation and billing on March 26, 2015.

46. On or about April 22, 2015, Mrs. Kietzman advised Mrs. Dozier that there was several hundred thousand dollars floating around in coding and medical records. As such, Mrs. Kietzman requested to meet with Mrs. Dozier to discuss this issue. A meeting was held soon thereafter between Mrs. Dozier, Mrs. Morgan and Mrs. Kietzman, wherein Mrs. Kietzman discussed the paperwork issues, and specifically, the failure of physicians completing the required documentation for procedures that were performed. This practice, in turn, was holding up the processing of bills by the hospital's coding and billing department. As a consequence,

Mrs. Dozier asked Mrs. Kietzman for specific examples of such, which she provided. In the course of this conversation, CMS requirements for coding and billing were discussed.

47. In approximately mid-April, 2015, Mrs. Kietzman identified another compliance concern to Mrs. Morgan and Mrs. Hallgarth about the billing and placement of fiducial markers. The placement of interstitial devices for radiation therapy (i.e. fiducial markers and dosimeter) are billed to Medicare for providing services for implantable tissue markers to Medicare beneficiaries. They told Mrs. Kietzman to discuss the issue with Ms. Distel and Ms. Combs, since they did not want to discuss any sort of compliance issue.

48. On or about May 7, 2015, a discussion occurred amongst Mrs. Kietzman, Ms. Combs, and Ms. Distel about the billing of fiducial markers by the urologists, who were contractors not employed by KDHS. The urology department desired that the Cancer Center begin to purchase fiducial markers for the urologists to place them. In this meeting, Ms. Distel explained that the KDHS paid for the fiducial markers, but that KDHS received credit for the billing within its budget for the markers and placement. Ms. Combs advised that since the urology department is receiving credit for the billing for the fiducial markers, there were no compliance concerns. However, Mrs. Kietzman voiced her concerns that the KDHS was illegally enticing the urologists to send patients to it since the hospital was paying the urologists, and purchasing the fiducial markers.

49. Had the United States been aware of this illegal enticement, it would not have paid the claims for the fiducial markers to KDHS; thus, the absence of such disclosure of the enticement, to the United States, by KDHS, which was required, by KDHS was a materially false statement. Furthermore, KDHS made repeated false and material certifications to the United States from January 19, 2010 to the present in connection of its presentment of numerous claims

to the United States, that it was in compliance with federal standards, when in fact it was not. Had KDHS accurately informed the United States of its practices, the United States would not have paid the claims in question.

50. In or about June 20, 2015, the electronic record system went live for the Cancer Center. Around that same time, Mrs. Kietzman informed Mrs. Morgan that in order to comply with the "meaningful use" mandate, only physicians and credentialed medical assistants should have access to, and be entering orders into the electronic medical system, with appropriate documentation. According to CMS, order entry for radiology orders must be directly entered by a licensed healthcare professional or a credentialed medical assistant. This requirement falls under the "meaningful use" mandate set by CMS. Mrs. Morgan replied that they needed to help the physicians "get where they needed to be." Mrs. Kietzman responded that it would be inappropriate and illegal to do so. From at least June 20, 2015 to the present, KDHS fraudulently and knowingly submitted invoices to the United States for payment, which were submitted based on orders entered by non-physicians and non-credentialed medical assistants. Had the United States been aware of this violation of the meaningful use mandate, it would not have paid the claims for services and procedures conducted in violation of the "meaningful use" mandate to KDHS; thus, the absence of such disclosure of non-compliance with the meaningful use mandate, to the United States, by KDHS, which was required, by KDHS was a materially false statement. Furthermore, KDHS made repeated false and material certifications to the United States from January 19, 2010 to the present, in connection of its presentment of numerous claims to the United States, that it was in compliance with federal standards, when in fact it was not. Had KDHS accurately informed the United States of its practices, the United States would not have paid the claims in question.

51. In that same period, Mrs. Kietzman addressed the issue of physician coverage with Mrs. Dozier and Mrs. Morgan for medical oncology. Mrs. Morgan and Mrs. Dozier instructed Mrs. Kietzman to find a physician within KDHS to be the "supervising provider" for medical oncology, if a medical oncologist was absent, pursuant to CMS regulations. A series of e-mails and meetings ensued about this issue. Subsequently, Mrs. Kietzman arranged for a surgeon to obtain certain training and education on oncology issues sufficient to meet CMS guidelines for a supervising provider.

52. In or about mid-July, 2015, Mrs. Kietzman underwent a surgery and was off work for approximately two weeks. During that time, Mrs. Morgan knowingly and illegally assigned a nurse to perform physician documentation and entry. Mrs. Morgan and Mrs. Dozier also knowingly and illegally assigned physicians who did not meet "supervising provider" criteria to perform those roles. Specifically, the physicians in question did not have privileges to order the procedures in question. Upon her return from medical leave, Mrs. Kietzman raised serious concerns about the "supervising provider" issue with Mrs. Dozier and Mrs. Morgan. From at least mid-July, 2015, to the present, KDHS fraudulently and knowingly submitted invoices to the United States for payment, which were submitted based on treatment ordered by non-qualified physicians, who did not have the background and privileges to make the orders in question. Had the United States been aware of this violation of the "supervising provider" mandate, it would not have paid the claims for services and procedures ordered by non-qualified providers to KDHS; thus, the absence of such disclosure of non-compliance with the meaningful use mandate, to the United States, by KDHS, which was required, by KDHS was a materially false statement. Furthermore, KDHS made repeated false and material certifications to the United States from January 19, 2010 to the present, in connection of its presentment of numerous claims

to the United States, that it was in compliance with federal standards, when in fact it was not. Had KDHS accurately informed the United States of its practices, the United States would not have paid the claims in question.

53. On or about August 19, 2015, upon discovering that the office coordinator and other non-qualified personnel were performing order entry and documentation, Mrs. Kietzman advised Mrs. Morgan that no one other than a physician or credentialed medical assistant could perform those duties. This practice did not comply with "meaningful use" mandate.

54. On or about August 27, 2015, Ms. Gosman advised the Cancer Center (including but not limited to, Mrs. Kietzman, Ms. Higginbotham, Ms. Yager, Ms. Hienz and Ms. Darnell) that there was support for billing from the Association of Community Cancer Centers that she discovered while attending the National Oncology Conference. Ms. Gosman additionally advised that the providers in California who were having billing issues regarding this code didn't take the necessary steps needed to support their billing practices. She did not attach or provide any follow up for this statement.

55. Mrs. Kietzman emailed Mrs. Morgan on or about August 31, 2015 to alert her that she was able to sit down with the medical oncologist to discuss his lack of documentation and billing practices.

56. On or about September 9, 2015, Mrs. Kietzman advised Mrs. Morgan that physicians were calling in and requesting days off that were affecting the ability to administer radiation therapy. According to CMS, radiation therapy requires direct supervision. Direct supervision requires a physician to provide supervision by being immediately available and interruptible to provide assistance and direction throughout the performance of the procedure. CMS does not require the physician to be present in the room when the procedure is performed.

Mrs. Kietzman reminded Mrs. Morgan of this CMS requirement. Mrs. Morgan replied that they would "have to make it work," because a physician was unable to come in.

57. On or about September 15, 2015, Ms. Higginbotham, an HIMS coder, sent an email to the Cancer Center employees, including Mrs. Kietzman, to discuss a meeting that occurred regarding radiation oncology. Ms. Higginbotham stated that the conclusion of this meeting was that the charge in question was only a radiation oncology charge and did not require a report to be documented. As such, Ms. Higginbotham stated that patients should not be charged for every one that is done in the radiation oncology department. Ms. Higginbotham again confirmed that this practice was in agreement with the Revenue5 Cycle at the ACCC Oncology meeting. In this email chain, Ms. Higginbotham inquired into whether the Cancer Center should be billing all the radiation oncology patients for this reading and interpretation by the radiologists.

58. That same day, September 15, 2015, at 3:26 p.m., Kim True, the Nuclear Medicine Technologist and PACS Administrator, responded to Ms. Higginbotham's email stating that the current process of the radiologists reading the treatment planning CT scans was approved by Ms. Dozier per an email dated February 4, 2015. Mrs. Kietzman responded to Ms. True's email at 4:09 p.m., stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them. Mrs. Kietzman's email was sent to everyone on the email chain, including Mrs. Dozier. At 5:30 p.m., Mrs. Dozier replied to Mrs. Kietzman's email stating, "[w]hy would you copy all these people on this question? This is unprofessional." An hour later, at 6:56 p.m., Mrs. Dozier sent another email to Mrs. Kietzman apologizing if the email sounded harsh and stated, "the radiologists are very sensitive on this and when we mention charging, they get defensive."

59. Mrs. Dozier's response in her evinces her knowledge and participation in the fraudulent billing conspiracy between KDHS and the independent contractor radiologists.

60. On or about September 16, 2015, Mrs. Morgan requested, by e-mail at 1:05 p.m., that Mrs. Kietzman meet with her to discuss the email exchange from the previous day. Mrs. Kietzman responded and indicated that she was available all day to meet with her. However, Ms. Morgan never responded back to Mrs. Kietzman to set up a time to meet even though Mrs. Morgan was in the hospital that day.

61. Mrs. Morgan met with Mrs. Kietzman, early in the morning, on or about September 17, 2015 to discuss the email exchange from September 15, 2015. Mrs. Morgan advised Mrs. Kietzman that she should have been at Mrs. Dozier's door first thing yesterday morning apologizing for her actions. Mrs. Kietzman responded that she was unclear why Mrs. Dozier was so upset with her. Mrs. Kietzman reiterated that her email simply expressed that the radiologists were reading the tests for good patient care, but would not charge for it. Mrs. Morgan responded that Mrs. Kietzman was being "disrespectful," and she needed to make the situation "right" with Mrs. Dozier. Mrs. Kietzman again reiterated that her email supported what Mrs. Dozier said was the Cancer Center's practice. Mrs. Kietzman additionally advised Mrs. Morgan that she was uncomfortable with the fact that Mrs. Dozier was so upset with her for supporting her statement to others involved in the process. She also stated that she found it interesting that Mrs. Dozier apologized an hour later for her email. Mrs. Kietzman expressed that people sometimes get emotional for feelings of guilt, implying that Mrs. Dozier felt guilty for these practices, and that Mrs. Kietzman was considering reporting the matter to the federal government. Mrs. Morgan responded, "[C]hoose your words very carefully."

62. Following her meeting with Mrs. Morgan, Debbie Bridges, a nurse within KDHS, who also reports to Mrs. Morgan, and a colleague of Mrs. Kietzman called on an unrelated issue. Ms. Bridges noticed that Mrs. Kietzman was upset and offered to come over and discuss the situation with her. Mrs. Kietzman had previously addressed her concerns about ongoing illegal activities at KDHS with Ms. Bridges. Ms. Bridges advised Mrs. Kietzman that she did not want details of the conversation, but asked her if the recent conversation between Mrs. Morgan and Mrs. Kietzman had anything to do with suspicions of fraud. Mrs. Kietzman did not respond for fear of retaliation from Morgan and Dozier.

63. Later in the day on September 17, 2015, Mrs. Dozier requested a meeting with Mrs. Kietzman and Mrs. Morgan. Mrs. Dozier first apologized for the harshness of her email. Mrs. Dozier asked Mrs. Kietzman to clarify any questions she may have before she sends out emails. Mrs. Kietzman advised Ms. Dozier that she believed her email was supporting the practice of the radiologists reading CT scans, but not charging for them, since such charges would be illegal. Mrs. Kietzman noted that if the billing were occurring, she would need to report it to the federal government. Mrs. Dozier responded that it is "touchy with the radiologists when you talk about money." Mrs. Dozier stated that it seemed that her and Mrs. Kietzman were always on a "different page." Mrs. Dozier additionally told Mrs. Kietzman that she was unprofessional and unsupportive of the organization. She also expressed that she could not trust her. This statement related back to Mrs. Kietzman's opposition to the termination of Mrs. Meyer, following her threat of involving the federal government with KDHS' billing practices, and with Mrs. Kietzman's opposition to ongoing fraud and her threat of reporting the issue to the federal government.

64. Mrs. Kietzman replied that it was hurtful to hear that, and that she felt as though Mrs. Dozier did not know her because people who did know her would not feel that way. Mrs. Dozier told Mrs. Kietzman that she could not take "no" for an answer. Mrs. Kietzman defended herself by saying that there were certain things that she did not understand, but that she did not ask her for many things. Mrs. Kietzman additionally advised that she was good at her job and took care of most things without additional help. However, she did advise that Mrs. Dozier had told her "no" after making several requests. Mrs. Kietzman explained that she does not make requests until she can answer the following question: "Does this make sense for patient care, patient satisfaction, quality, financially and employee satisfaction?" Mrs. Kietzman followed-up stating that Mrs. Dozier certainly did not owe her an explanation, but she does not know why her requests were not approved. As such, Mrs. Kietzman agreed that it is difficult to accept "no" when her requests should have been approved.

65. On or about September 23, 2015, Mrs. Kietzman received an email from Ms. Heinz wherein Ms. Heinz confirmed that the Cancer Center didn't start entering the CPT code for RadPlanning until they moved to the new center, i.e. February 2015 (it would have been entered into the system and billed by radiology or some other group prior to that date).

66. On or about September 30, 2015, Ms. Gosman sent an email stating that, if radiology was charging for planning, then the CT acquisition charge would need to be inactivated to avoid duplicate billing. Her opinion was that this change needed to be implemented that day. Rachelle Mowery, a Corporate Compliance representative, responded stating that RadPlanning was not being performed in the Medical Imaging Department. She recommended changing the relevant charge to a $0 charge. She additionally stated the Ms. Heinz would charge planning when applicable. She sent a follow-up email stating that it was her

impression that radiation oncology was entering charges for planning in 2014 (or before that) and that the Cancer Center did not start entering the CT acquisition charge until February 2015. Ms. Heinz responded to her email confirming that planning did not start being entered by the Cancer Center until that time.

67. On or about October 2, 2015, Mrs. Kietzman saw Mrs. Morgan in the hospital, but Mrs. Morgan refused to speak to her. This was odd behavior as Mrs. Morgan was always, at least prior to February 2015, very friendly to Mrs. Kietzman.

68. On or about October 5, 2015, Mrs. Kietzman decided to speak with someone in the Human Resources Department, specifically Ms. Poling; however, she ultimately spoke with Donna Mills, the Secretary of Human Resources, who informed her that Ms. Poling was not in the office. Mrs. Kietzman sent a text to Mrs. Polling, advising that she needed to speak with her. Mrs. Kietzman then went to see Ms. Combs, but when she walked into the doorway of Ms. Combs' office, Mrs. Dozier was in there. Mrs. Kietzman advised Ms. Combs that she needed to speak with her that day, and Ms. Combs agreed to do so.

69. Later that day, Mrs. Morgan met with Mrs. Kietzman and informed her that her employment was terminated. Mrs. Morgan provided her with a termination letter dated October 2, 2015. The letter alleged that Mrs. Kietzman was not happy in her position and that her staff were not pleased with her. The letter additionally alleged that Mrs. Kietzman applauded employees who were considering a job change and that there were ongoing issues within the department, but Mrs. Kietzman refused to make the necessary changes to address these issues. The letter cited miscommunications and lack of leadership on Kietzman's behalf. Specifically, the letter stated, "[Y]ou have had two separate instances with the CEO that were less than

exemplary." Lastly, the letter cited concerns from directors, deficiencies in open positions and issues surrounding failing to utilize appropriate channels for pre-employment screening.

70. Notwithstanding the largely pretextual contents of the letter, the cause of Mrs. Kietzman's termination was due to her opposition to ongoing fraudulent billing of the United States Government, in and within, the Cancer Center, and her statements that she would report such activity to the federal government and pursue legal action.

71. On the following day, Mrs. Kietzman advised Ms. Poling that she no longer needed to meet with her because she felt as though it would not do any good nor change the outcome. Mrs. Kietzman advised Ms. Poling that she did not feel that her termination was warranted. Instead of answering her questions, Ms. Poling told Mrs. Kietzman to "refer to the content of your letter."

72. Following her termination, Mrs. Kietzman caused a letter to be placed in her file, as of record, that indicated her disagreement with the letter, and indicated that her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by KDHS, and retaliation by Mrs. Dozier and Mrs. Morgan for Mrs. Kietzman not turning her head the other way.

73. Upon information and belief, starting at least from January 19, 2010 to the present, KDHS, directly, or through authorized agents, contractors, or others, has invoiced CMS and the United States, and the United States has paid to KDHS, for fraudulent billings in that KDHS has invoiced CMS and the United States for full radiological reads, while KDHS has, in fact, performed limited or follow up ultrasounds that should have been billed and reimbursed under different CPT codes. There are (in oncology and obstetrics) a professional and a technical component that are charged. Had the United States known of these practices, it would not have

paid submitted claims by KDHS; as such, the submissions, including false certifications of compliance by KDHS from January 19, 2010 to the present, are material.

74. Specifically, Mrs. Kietzman was a member of the Maternal/Child Health Committee at KDHS. The committee involves physicians, administrators, OB leadership, quality, and Mrs. Kietzman. Specifically, Mrs. Morgan and the V.P. of Physician Services is and has been on the committee.

75. At some time between 2007 and 2009, at one of the committee meetings, one of the OB physicians raised the issue that when she ordered or requested limited or partial ultrasounds, she was instead receiving a full anatomical ultrasound from radiology at KDHS. This physician also indicated that other hospitals from whom she received reports would provide partial or limited ultrasound results upon her request. This discussion was memorialized in the meeting minutes for the committee. However, this issue was never corrected or addressed, and KDHS continued to knowingly and fraudulently bill the United States for these unnecessary procedures, from January 19, 2010 to the present. Mrs. Morgan has, and continues to be aware of this fraudulent billing, and has permitted and encouraged it to occur.

76. Upon information and belief, both Mrs. Morgan and Mrs. Dozier are aware of this fraudulent billing, and have, failed to correct same. Furthermore, since January 19, 2010, KDHS has fraudulently billed the United States significant amounts per year for these procedures.

77. Furthermore, upon information and belief, there are additional unknown, but ongoing, fraudulent billing by KDHS to CMS and/or the United States, and specifically by or in relation to its radiology department, for unnecessary and/or inappropriate procedures. Had the United States known of these practices, it would not have paid submitted claims by KDHS; as

such, the submissions, including false certifications of compliance by KDHS from January 19, 2010 to the present, are material.

78. Upon information and belief, from January 19, 2010 to the present, for each of the foregoing fraudulent billing practices, the United States actually paid the false claims in question. Had the United States known of these practices, it would not have paid submitted claims by KDHS; as such, the submissions, including false certifications of compliance by KDHS from January 19, 2010 to the present, are material.

## V. CAUSES OF ACTION

### COUNT I: SUBMISSION OF FALSE OR FRAUDULENT CLAIMS TO MEDICAID IN VIOLATION OF THE FALSE CLAIMS ACT

79. Mrs. Kietzman hereby incorporates by reference the previous paragraphs of her complaint as if the same were set forth at length herein.

80. From January 19, 2010 to the present, Defendant knowingly presented or caused false or fraudulent claims to be submitted to Medicare for reimbursement.

81. Medicare is an agency of the United States Department of Health and Human Services, which is a department within the Government of the United States of America.

82. From January 19, 2010 to the present, Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

83. Specifically, from January 19, 2010 to the present, Defendant KDHS has submitted routine and systemic claims to the United States for payment, while falsely certifying to the United States in connection with such claims, that KDHS, and its employees and contractors were acting in compliance with governmental standards and procedures, including

that claims submitted were necessary and appropriately billed. Had the United States known the truth of KDHS' claims and compliance status, as set forth in significant detail in this Second Amended Complaint, it would not have paid the claims in question. As such, the false certifications and absence of disclosure to the United States were and are material.

84. From January 19, 2010 to the present, Defendant intentionally and willfully presented or caused numerous false claims to be presented to the United States of America in violation of 31 U.S.C. § 3729(a). The United States actually paid these claims.

85. As a consequence of the foregoing, Defendant is liable for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Defendant under 31 U.S.C. § 3729(a). Defendant is further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

**COUNT II: CONSPIRACY TO DEFRAUD THE GOVERNMENT IN VIOLATION OF THE FALSE CLAIMS ACT**

86. Mrs. Kietzman hereby incorporates by reference the preceding paragraphs of her complaint as if the same were set forth at length herein.

87. From January 19, 2010 to the present, Defendant, its authorized agents and representatives, and/or its employees conspired with the independent contractor radiologists, urologists, and/or their employers, to defraud the Government of the United States of America by getting the aforementioned false or fraudulent claims allowed or paid.

88. From January 19, 2010 to the present, Defendant intentionally and willfully conspired with the independent contractor radiologists, urologists, and/or their employers, to defraud the Government of the United States of America in violation of 31 U.S.C. § 3729(a)(3).

89. As a consequence of the foregoing, Defendant is liable for a civil penalty of not less than $5,000 and not more than $10,000, per violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of Defendant under 31 U.S.C. § 3729(a). Defendant is further liable for reasonable expert and attorney fees and costs under 31 U.S.C. § 3730.

**COUNT III: WRONGFUL TERMINATION**

90. Mrs. Kietzman hereby incorporates the preceding paragraphs of her complaint as if the same were set forth at length herein.

91. Mrs. Kietzman was terminated for voicing her concerns regarding an illegal act occurring in violation of State and/or Federal guidelines and in reporting same to the federal government, which would lead to civil and/or criminal actions against KDHS, and the act of voicing her concerns was a factor in Defendant's decision to terminate Mrs. Kietzman.

92. Defendant's actions were intentional, willful and in reckless disregard of Mrs. Kietzman's rights as protected by Indiana State Law.

93. Mrs. Kietzman suffered damages as a result of Defendant's unlawful actions.

**COUNT IV: RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT**

94. Mrs. Kietzman hereby incorporates by reference the preceding paragraphs as if the same were set forth at length herein.

95. Mrs. Kietzman undertook action in furtherance of an enforcement action by repeatedly voicing her concerns regarding fraudulent billing for Medicare, and by indicating that she was contemplating the action of reporting the matter to the federal government.

96. Defendant had knowledge that Mrs. Kietzman was engaged in protected conduct by virtue of their knowledge of Mrs. Kietzman's accusations and statements.

97. Mrs. Kietzman was discharged, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment because of her lawful acts in furtherance of an action under 31 U.S.C. § 3730 as well as other efforts to stop one or more violations of this 31 U.S.C. § 3729 and 3730.

98. Mrs. Kietzman's discharge was motivated by her involvement in protected conduct. Mrs. Kietzman had received exemplary employee reviews prior to 2015, and would not have been discharged had she not raised questions about compliance and made statements about her concerns of ongoing fraud and reporting KDHS to the federal government due to the ongoing fraud.

99. Defendant violated Mrs. Kietzman's rights as protected by the False Claims Act, 31 U.S.C. § 3729 et seq.

100. Defendant's actions were intentional and/or in reckless disregard for Mrs. Kietzman's rights as protected by the False Claims Act, 31 U.S.C. § 3729 et seq.

101. Mrs. Kietzman has suffered damages as a result of Defendant's unlawful actions. She seeks, among other things, reinstatement with the same seniority status that employee, contractor, or agent would have had but for the retaliatory conduct, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, as permitted under 31 U.S.C. § 3730(h).

## REQUESTED RELIEF

WHEREFORE, Plaintiff, Jessica Kietzman, by counsel, respectfully requests that this Court find for her and order Defendant to:

1. Be enjoined from any further violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*;
2. Reimburse the United States Government for each and every false claim it has submitted for reimbursement from January 19, 2010 to the present;
3. Pay penalties for each violation of the False Claims Act of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the Government sustains because of the act of Defendant under 31 U.S.C. § 3729(a).
4. Pay to Mrs. Kietzman an award under the False Claims Act, 31 U.S.C. § 3730(d);
5. Pay pre- and post-judgment interest to Mrs. Kietzman;
6. Pay Mrs. Kietzman's attorneys' fees and costs incurred in litigating this action;
7. Pay to Mrs. Kietzman all wages, benefits, compensation, and other monetary loss suffered as a result of Defendant's unlawful actions, including reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, as permitted under 31 U.S.C. § 3730(h);
8. Pay to Mrs. Kietzman compensatory and punitive damages for her wrongful discharge; and
9. Pay to Mrs. Kietzman any and all other legal and/or equitable damages that this Court determines appropriate and just to grant.

Respectfully submitted,

*s/Thomas B. Bruns*

Thomas B. Bruns (0051212)
BRUNS, CONNELL, VOLLMAR &
ARMSTRONG, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
Phone: 513-326-0274
Fax: 513-800-1263
tbruns@bcvalaw.com
*Attorney for Plaintiff*

Andrew Dutkanych, #23551-49
Krista A. Willike, #32550-10
BIESECKER DUTKANYCH & MACER, LLC
101 N. 7th Street
Louisville, KY 40202
Telephone: (502) 561-3443
Facsimile: (502) 561-3444
E-mails: ad@bdlegal.com
kwillike@bdlegal.com
*Counsel for Plaintiff*

**DEMAND FOR JURY TRIAL**

Plaintiff, Jessica Kietzman, by counsel, respectfully requests a jury trial as to all issues in this matter deemed so triable.

Respectfully submitted,

*s/Thomas B. Bruns*

Thomas B. Bruns (0051212)
BRUNS, CONNELL, VOLLMAR &
ARMSTRONG, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
Phone: 513-326-0274
Fax: 513-800-1263
tbruns@bcvalaw.com
*Admitted Pro Hac Vice*

Andrew Dutkanych, #23551-49
Krista A. Willike, #32550-10
BIESECKER DUTKANYCH & MACER, LLC
101 N. 7th Street
Louisville, KY 40202
Telephone: (502) 561-3443
Facsimile: (502) 561-3444
E-mails: ad@bdlegal.com
kwillike@bdlegal.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2017 a copy of the foregoing was filed via the Court's CM/ECF system, which will provide notice to all counsel.

Rodney L. Scott
Waters, Tyler, Hofman Scott, LLC
1947 East Spring St.
New Albany, IN 47150
rscott@wthslaw.com

Shelese M. Woods
U.S. Attorneys' Office
10 West Market St., Suite 2100
Indianapolis, IN 46204
Shelese.woods@usdoj.gov
Counsel for the United States of America

Michael W. Hawkins
Jennifer Orr Mitchell
Matthew S. Arend
Dismore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
michael.hawkins@dinsmore.com
jennifer.mitchell@dinsmore.com
matthew.arend@dinsmore.com

s/Thomas B. Bruns
Thomas B. Bruns (0051212)

Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45202
513-312-9890
513-800-1263 Fax