**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA, *ex rel.* JESSICA KIETZMAN** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CAUSE NO: 4:16-CV-00009-SEB-DML** |
| **THE BETHANY CIRCLE OF KING'S DAUGHTERS' OF MADISON, INDIANA, INC. d/b/a The King's Daughters' Hospital and Health Services** | ) | |
| **Defendant.** | ) | |

**RESPONSE BY PLAINTIFF/RELATOR, JESSICA KIETZMAN, IN OPPOSITION TO MOTION TO DISMISS**

Jessica Kietzman ("Mrs. Kietzman") by and through Counsel, submits this Response in Opposition to Defendant's Motion to Dismiss.

## I. INTRODUCTION

Misleadingly, Defendant cites this Court to many decisions that do not involve dismissal motions at all – but rather involve summary judgment proceedings. Defendant conflates, misreads, and misrepresents cases that actually stand for the proposition that dismissal is not warranted. It engages in a hyper-technical and strict reading of the Amended Complaint in this matter, and fails to draw appropriate inferences from the facts as plead, in contravention of the applicable standard.

Presently, a Motion to Amend the Complaint is pending. Plaintiff/Relator anticipates unfortunate and unwarranted opposition to that Motion, but, under both this Court and the Seventh Circuit's case law, that motion should be granted. That amendment addresses many of the issues raised in Defendant's Motion to Dismiss, and, to the extent it does not, Defendant's Motion is simply incorrect.

## II. FACTS

1. <u>The Qui Tam Allegations</u>

Defendant hired Mrs. Kietzman in or about 1999 as a unit secretary, she was later promoted to a nurse intern in 1999, later to a staff nurse in 1999, then to a charge nurse in 2000, and then to nursing supervisor in 2004. (Pl.'s Compl. ¶ 8). Since 2007, she was promoted to, and has served as, the Oncology Service Line Director where she supervised and directed the Cancer Center at KDHS ("Cancer Center"). *Id.* From 2007 through 2009, Mrs. Kietzman was also the Women's Service Line Director at KDHS (i.e. covered OB/GYN, and women's care). *Id.* Mrs. Kietzman is a licensed registered nurse within the State of Indiana. *Id.* Mrs. Kietzman held the position of Director of the Cancer Center until her termination from employment by Defendant on or about October 5, 2015. *Id.*

Current Procedural Terminology ("CPT") medical code sets are maintained by the American Medical Association through the CPT Editorial Panel. (Pl.'s Compl. ¶ 15). The CPT code set describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes. *Id.* The CPT code identifies the services rendered rather than the diagnosis on the claim. *Id.* CPT codes are identified and utilized by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that handles claims for payment for hospital and medical services to patients for payment by the United States government. *Id.*

When a Medicare claim is submitted, it processes through a series of edits in the Fiscal Intermediary Standard System to ensure that the information provided is complete and correct.

(Pl.'s Compl. ¶ 16). If the claim is deemed incomplete or incorrect, it is sent to a return to provider ("RTP") file. *Id.* Thus, improper claims that do not meet standards are not paid.

Since at least January 1, 1999, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. (Pl.'s Compl. ¶18).[1] On February 23, 2015, the Cancer Center moved to a new facility. *Id.* Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. *Id.*

Since at least January 1, 1999, KDHS radiologists would conduct second full diagnostic read for radiation treatment planning scans ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary. *Id.* Since at least January 1, 1999, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. *Id.* Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads per year; and a significant percentage of these patients were Medicare/Medicaid patients. *Id.* As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans. *Id.*

On or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Mrs. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring whether they billed CMS for the second scan. (Pl.'s Compl. ¶¶ 11, 19). Every hospital responded within a week of August 1, 2014, that they did not

[1] These radiologists are independent contractors and are not employees of KDHS. (Pl.'s Proposed Second Amended Complaint).

bill CMS for the second scan, with several hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 19. That email demonstrates scienter, intent, and knowledge by Defendant about the issue – and yet Defendant persisted with its illegal conduct after August, 2014.

On or about January 29, 2015, Mrs. Dozier advised the Cancer Center staff, including Mrs. Kietzman, that its physicians were going to continue to bill for full diagnostic reads for RadPlanning. (Pl.'s Compl. ¶ 24). This was done despite the August, 2014 email from Ms. Combs and the response from other hospitals that such procedures were illegal and improper.

Additional communications related to the illegal charges occurred throughout early 2015. (Pl.'s Compl. ¶¶ 24-32). These same communications evince an intent to present knowingly false claims to the federal government. *Id.* There were further follow ups on this issue up until Mrs. Kietzman's termination. (Pl.'s Compl. ¶¶ 33-44).

Actions in September, 2015, wherein additional questions were raised regarding the follow up billing (which occurred into 2015), demonstrate an extremely aggressive and unwarranted response by Mrs. Dozier and Mrs. Morgan (another high-level hospital employee) towards discussion of the codes at issue. (Pl.'s Compl. ¶¶ 45-54). These allegations demonstrate the continued presentment of knowingly false claims to the United States. *Id.*

Plaintiff plead that Defendant knowingly presented or caused false or fraudulent claims to be submitted to Medicare for reimbursement. (Pl.'s Compl. ¶ 65). Plaintiff also plead that Medicare is an agency of the United States Department of Health and Human Services, which is a department within the Government of the United States of America. (Pl.'s Compl. ¶ 66). Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. (Pl.'s Compl. ¶ 67). Defendant

intentionally and willfully presented or caused a false claim to be presented to the United States of America in violation of 31 U.S.C. § 3729(a). (Pl.'s Compl. ¶ 68).

2. Retaliation By Defendant After Plaintiff Raised The Issue of Fraud

On or about the week of January 19, 2015 through January 23, 2015, outside contractor trainers from Siemens USA, with whom KDHS purchased CT scanning equipment, were onsite at KDHS to conduct training. (Pl.'s Compl. ¶ 25). Thereafter, they were onsite to conduct hands-on training with patients the week of February 9, through February 13, 2015. *Id.* During this second onsite training period, the Siemens USA trainers questioned the KDHS protocols, and specifically, the medical imaging diagnostic reads for any scans that followed the IDS. *Id.* Mrs. Meyer was in the room, heard these conversations, and indicated that it was inappropriate and illegal. She further stated that she would turn KDHS into the United States Government for fraudulent billing if this practice did not immediately stop. *Id.*

On February 12, 2015, Jo Purvis informed Mrs. Kietzman via email as to Mrs. Meyer's "inappropriate" comments about the fraudulent billing. (Pl.'s Compl. ¶ 27). She copied Mrs. Dozier and Susan Poling, the Human Resources Director, on that email. *Id.* Following the Purvis email, Mrs. Morgan approached Mrs. Kietzman and confirmed Mrs. Meyer's comments about the fraudulent billing, and advised that Mrs. Dozier intended to terminate Mrs. Meyer's employment as a result of the comments. (Pl.'s Compl. ¶ 28). Mrs. Kietzman indicated to Mrs. Morgan that it was inappropriate and would be detrimental to the Cancer Center to terminate Mrs. Meyer's employment. (Pl.'s Compl. ¶ 29). As such, Mrs. Kietzman requested to join Mrs. Meyer in a meeting with Mrs. Morgan and Mrs. Dozier. *Id.*

This meeting occurred on February 15, 2015, in which a detailed discussion occurred about radiation treatment planning CT, documentation, billing and charges. (Pl.'s Compl. ¶ 30). Mrs.

Dozier told Mrs. Meyer that her comments were inappropriate, and that she would not tolerate anyone who threatened to report any of KDHS' practices to the federal government, nor would she permit anyone who did so to remain employed by KDHS. *Id.*

In an effort to keep her employment, Mrs. Meyer apologized for making the comments to Mrs. Dozier and Mrs. Morgan. (Pl.'s Compl. ¶ 31). Mrs. Kietzman again reiterated that Mrs. Meyer should not be terminated. *Id.* At that same meeting, Mrs. Dozier indicated that the KDHS process of having radiologists conduct and read the follow up scans was for "best patient care," but that KDHS did not bill for it. *Id.* Although Mrs. Kietzman and Mrs. Meyer were unaware at the time, this statement by Mrs. Dozier was a knowing, intentional lie designed to deflect attention from the ongoing fraudulent scheme being perpetrated by KDHS, Mrs. Dozier, and Mrs. Morgan against the United States Government and others. *Id.*

On September 15, 2015, at 3:26 p.m., Kim True, the Nuclear Medicine Technologist and PACS Administrator, responded to Ms. Higginbotham's email stating that the current process of the radiologists reading the treatment planning CT scans was approved by Mrs. Dozier per an email dated February 4, 2015. (Pl.'s Compl. ¶ 46). Mrs. Kietzman responded to Ms. True's email at 4:09 p.m., stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them. *Id.* Mrs. Kietzman's email was sent to everyone on the email chain, including Mrs. Dozier. *Id.* At 5:30 p.m., Mrs. Dozier replied to Mrs. Kietzman's email stating, "[w]hy would you copy all these people on this question? This is unprofessional." *Id.* An hour later, at 6:56 p.m., Mrs. Dozier sent another email to Mrs. Kietzman apologizing if the email sounded harsh and stated, "the radiologists are very sensitive on this and when we mention charging, they get defensive." *Id.*

Mrs. Morgan met with Mrs. Kietzman, early in the morning, on or about September 17, 2015 to discuss the email exchange from September 15, 2015. (Pl.'s Compl. ¶ 48). Mrs. Morgan advised Mrs. Kietzman that she should have been at Mrs. Dozier's door first thing yesterday morning apologizing for her actions. *Id.* Mrs. Kietzman responded that she was unclear why Mrs. Dozier was so upset with her. Mrs. Kietzman reiterated that her email simply expressed that the radiologists were reading the tests for good patient care, but would not charge for it. *Id.* Mrs. Morgan responded that Mrs. Kietzman was being "disrespectful," and she needed to make the situation "right" with Mrs. Dozier. *Id.* Mrs. Kietzman then reiterated that her email supported what Mrs. Dozier said was the Cancer Center's alleged practice. *Id.* Mrs. Kietzman additionally advised Mrs. Morgan she was uncomfortable with the fact that Mrs. Dozier was so upset with her for supporting Mrs. Dozier's own statement to others involved in the process. *Id.* Mrs. Kietzman also stated she found it interesting that Mrs. Dozier apologized an hour later for her own email. *Id.* Mrs. Kietzman expressed that people sometimes get emotional for feelings of guilt, implying that Mrs. Dozier felt guilty for these practices. Mrs. Morgan responded, "[C]hoose your words very carefully." *Id.*

Later in the day on September 17, 2015, Mrs. Dozier requested a meeting with Mrs. Kietzman and Mrs. Morgan. (Pl.'s Compl. ¶ 50). At that meeting, Mrs. Kietzman stated she believed her email was actually supporting the practice of the radiologists reading CT scans, but not charging for them, since such charges would be illegal. *Id.* Mrs. Dozier responded that it is "touchy with the radiologists when you talk about money." *Id.* Mrs. Dozier then stated it seemed that she and Mrs. Kietzman were always on a "different page." *Id.* Mrs. Dozier additionally told Mrs. Kietzman that Mrs. Kietzman was unprofessional and unsupportive of the organization. *Id.* She also expressed that she could not trust Mrs. Kietzman. *Id.*

Shortly thereafter Mrs. Kietzman received a termination letter. Notwithstanding the pretextual contents of the termination letter, the cause of Mrs. Kietzman's termination was due to her opposition to ongoing fraudulent billing of the United States Government, in and within, the Cancer Center. (Pl.'s Compl. ¶ 56). Following her termination, Mrs. Kietzman caused a letter to be placed in her file indicating her disagreement with the termination letter, and indicating that her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by KDHS, and retaliation by Mrs. Dozier and Mrs. Morgan for Mrs. Kietzman not turning her head the other way. (Pl.'s Compl. ¶ 58).

So, it is clear Mrs. Kietzman undertook action in furtherance of an enforcement action by repeatedly voicing her concerns regarding fraudulent billing of Medicare by KDHS. (Pl.'s Compl. ¶ 79). KDHS, through its agents, had knowledge that Mrs. Kietzman was engaged in protected conduct by virtue of their knowledge of Mrs. Kietzman's accusations. (Pl.'s Compl. ¶ 80). Mrs. Kietzman was discharged, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment because of her lawful acts in furtherance of an action under 31 U.S.C. § 3730, as well as other efforts to stop one or more violations of 31 U.S.C. § 3729 and 3730. (Pl.'s Compl. ¶ 81). Mrs. Kietzman's discharge was motivated by her involvement in protected conduct. (Pl.'s Compl. ¶ 82).

## III. LAW AND ARGUMENT

### A. Motion to Dismiss Standard

To survive a motion to dismiss, the plaintiffs' complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While specific facts are not necessary, *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam), the complaint must "'give the defendant fair notice of what

the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (omission in original), *quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

In assessing a Motion to Dismiss, a Court must determine if the allegations in the complaint state a plausible claim for relief. *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level ... ." *Twombly*, 550 U.S. at 555; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (plausibility requirement "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations"), *quoting Twombly*, 550 U.S. at 556.

The “plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, *quoting Twombly*, 550 U.S. at 556. A claim should survive a Rule 12(b)(6) motion to dismiss if the complaint contains well-pled facts—that is, not just legal conclusions—that permit the court to infer more than the mere possibility of misconduct. *Iqbal*, 556 U.S. at 679. In deciding or reviewing a Rule 12(b)(6) motion, a court does not ask did these things happen; instead, "the proper question to ask is still 'could these things have happened." *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 827 (7th Cir. 2014), *quoting Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010).

A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 2015 U.S. App. LEXIS 21189 (7th Cir. Ind. 2015).

The False Claims Act ("FCA") does involve claims of fraud, and the heightened pleading standard of Rule 9(b) must be met. *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).[2] That requires pleading the who, what, when, where, and how. *Id.* It is not necessary to identify each and every (or even any particular) false claim presented to the government – and Courts have thus not required a plaintiff to plead each and every false claim presented for payment. The Seventh Circuit noted that "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is inferential" and provided the inferences based on the facts are plausible, the claim will survive. *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 854 (7th Cir. 2009); *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. Wis. 2016)

Indeed, it is not even necessary to plead the details of an actually submitted false claim – rather details of the scheme are sufficient coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).[3]

Finally, in terms of scienter, [a]lthough Rule 9(b) does not require 'particularity' with respect to the [defendant's] mental state, the complaint must still afford a basis for belief that [the plaintiff] could prove scienter." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990).

---

[2] Compliance with Rule 9 is not required of the retaliation claim. *United States ex. rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004).

[3] Here, of course, if the Court believes that Mrs. Kietzman must identify specific patients for whom false claims were submitted to the United States concerning treatment in the Cancer Center, she can identify several, but is appropriately concerned about HIPAA in the context of such allegations and disclosures in a unsealed Amended Complaint. She respectfully requests guidance from this Court, due to the issues and Hobson's choice such issues present.

**B. In the event that Defendant's Motion is granted, in full, or in part, Plaintiff should be given the opportunity to amend**

At the outset, and as set forth in greater detail in this response, Plaintiff believes that the Amended Complaint is sufficient to survive dismissal. But even if it is somehow inadequate, Seventh Circuit case law is clear that Plaintiff should be permitted at least one opportunity to amend, to correct any deficiencies. *See, e.g., Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success."), *citing Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008); *Olson v. Champaign Cnty.*, 784 F.3d 1093, 2015 U.S. App. LEXIS 7143 (7th Cir. 2015). Such an amended complaint is pending, and, Plaintiff believes, is also sufficient. Plaintiff should nevertheless be given the opportunity to amend after this Court rules.

**C. The FCA Claim is adequately plead**

1. Scienter is adequately plead

Defendant first argues that scienter is inadequately plead, pointing solely to two issues: (1) the fiducial marker issue and the urologists, and, (2) the meaningful use mandate. By doing so, Defendant completely ignores the significant evidence that establishes scienter for the ongoing fraud at KDHS. For instance, with respect to the second scans being charged by the Cancer Center, the allegations are that: [o]n or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Mrs. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they (i.e., these other hospitals) billed CMS for the second scan. (Pl.'s Compl. ¶¶ 11, 19). Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several

hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 19. That email alone, ignored by Defendant in its motion, demonstrates scienter, intent, and knowledge by Defendant about the issue. Yet, Defendant persisted with its illegal conduct after August, 2014.

The FCA's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Universal Health Servs.*, 136 S. Ct. at 1996 (quoting 31 U.S.C. § 3729(b)(1)(A)). Unlike the other elements of an FCA claim, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 658 (7th Cir. 2015). *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, (7th Cir. 2016). Here, scienter is adequately plead.

As for the two issues Defendant raises regarding scienter, first, as respects the fiducial markers, the allegations were as follows:

> In approximately mid-April, 2015, Mrs. Kietzman identified another compliance concern to Mrs. Morgan and Mrs. Hallgarth about the billing and placement of fiducial markers. The placement of interstitial devices for radiation therapy (i.e. fiducial markers and dosimeter) are billed to Medicare for providing services for implantable tissue markers to Medicare beneficiaries. They told Mrs. Kietzman to discuss the issue with Ms. Distel and Ms. Combs, since they did not want to discuss any sort of compliance issue. (Pl.'s Compl. ¶ 36).
>
> On or about May 7, 2015, a discussion occurred amongst Mrs. Kietzman, Ms. Combs, and Ms. Distel about the billing of fiducial markers by the urologists, who were contractors not employed by KDHS. The urology department desired that the Cancer Center begin to purchase fiducial markers for the urologists to place them. In this meeting, Ms. Distel explained that the KDHS paid for the fiducial markers, but that KDHS received credit for the billing within its budget for the markers and placement. Ms. Combs advised that since the urology department is receiving credit for the billing for the fiducial markers, there were no compliance concerns. However, Mrs. Kietzman voiced her concerns that the KDHS was illegally enticing

> the urologists to send patients to it since the hospital was paying the urologists, and purchasing the fiducial markers. (Pl.'s Compl. ¶ 37).

The fact that the urologists were, as independent contractors, being paid a kickback on the fiducial markers placed by the urologists (a concern that was not alleviated by the fact that the hospital was being reimbursed for its costs for the markers), was never addressed by Distel. Defendant's arguments in this regard about Distel's response do not negate intent and *scienter* – rather, the failure to address the inducement/kickback allegation by Distel raises an inference that Defendant was actually acting with the requisite *scienter*.

The second issue Defendant raised concerns the meaningful use mandates; about which the allegations state:

> In or about June 20, 2015, the electronic record system went live for the Cancer Center. Around that same time, Mrs. Kietzman informed Mrs. Morgan that in order to comply with the "meaningful use" mandate, only physicians should have access to, and be entering orders into the electronic medical system, with appropriate documentation. According to CMS, order entry for radiology orders must be directly entered by a licensed healthcare professional. This requirement falls under the "meaningful use" mandate set by CMS. Mrs. Morgan replied that they needed to help the physicians "get where they needed to be." Mrs. Kietzman responded that it would be inappropriate to do so. (Pl.'s Compl. ¶ 38).
>
> In or about mid-July, 2015, Mrs. Kietzman underwent a surgery and was off work for approximately two weeks. During that time, Mrs. Morgan knowingly and illegally assigned a nurse to perform physician documentation and entry. Mrs. Morgan and Mrs. Dozier also knowingly and illegally assigned physicians who did not meet "supervising provider" criteria to perform those roles. Upon her return from medical leave, Mrs. Kietzman raised serious concerns about the "supervising provider" issue with Mrs. Dozier and Mrs. Morgan. (Pl.'s Compl. ¶ 40).
>
> On or about August 19, 2015, upon discovering that some nurses, the office coordinator, and a pharmacist for the Cancer Center were performing order entry and documentation, Mrs. Kietzman advised Mrs. Morgan that no one other than a physician could perform those duties. This practice did not comply with "meaningful use" mandate. (Pl.'s Compl. ¶ 41).

The relevant rule on "meaningful use" is found in federal regulation. It is explained, in some detail, by CMS in 80 F.R. 62762:

> Response: In the Stage 2 final rule (77 FR 53986) and in subsequent guidance in FAQ 9058, n6 we explained for Stage 2 that a licensed health care provider or a medical staff person who is a credentialed medical assistant or is credentialed to and performs the duties equivalent to a credentialed medical assistant may enter orders. We maintain our position that medical staff must have at least a certain level of medical training in order to execute the related CDS for a CPOE order entry. We defer to the provider to determine the proper credentialing, training, and duties of the medical staff entering the orders as long as they fit within the guidelines we have proscribed. We believe that interns who have completed their medical training and are working toward appropriate licensure would fit within this definition. We maintain our position that, in general, scribes are not included as medical staff that may enter orders for purposes of the CPOE objective. However, we note that this policy is not specific to a job title but to the appropriate medical training, knowledge, and experience.[4]

Office assistants are specifically prohibited under the relevant rules.

Ignoring all of this, Defendant cites, as supposed support for its lack of scienter on this issue, a cryptic response about an unrelated matter alleged at paragraph 42:

> On or about August 27, 2015, Ms. Gosman advised the Cancer Center (including but not limited to, Mrs. Kietzman, Ms. Higginbotham, Ms. Yager, Ms. Hienz and Ms. Darnell) that there was support for billing from the Association of Community Cancer Centers that she discovered while attending the National Oncology Conference. Ms. Gosman additionally advised that the providers in California who were having billing issues regarding this code didn't take the necessary steps needed to support their billing practices. She did not attach or provide any follow up for this statement. (Pl.'s Compl. ¶ 42).

The inference here (which must be drawn in Plaintiff's favor) is simple: the lack of follow up to this statement indicates knowledge of an improper procedure, and an attempted cover up (i.e. the lack of follow up or support for the statement). Again, Defendant appears to miss the mark. Scienter was adequately plead.

2. Falsity and Materiality is adequately plead

In *Universal Health Servs. v. United States ex. rel. Escobar*, 136 S.Ct. 1989 (2016), the United States Supreme Court adopted the implied certification theory. "According to this theory,

[4] See, also, https://questions.cms.gov/faq.php?id=5005&faqId=9058

when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment." *Id.* at 1995. "But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under §3729(a)(1)(A)." *Id.* The Supreme Court held: "that, at least in certain circumstances, the implied false certification theory can be a basis for liability." *Id.* "Specifically, liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.* "In these circumstances, liability may attach if the omission renders those representations misleading." *Id.*

*Escobar* involved a case involving alleged Medicare/Medicaid payment submissions, utilizing payment codes. *Id.* at 1997. It also involved allegations of non-qualified providers providing services. *Id.* Addressing the falsity allegations, the Supreme Court concluded that:

> So too here, by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, Arbour staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context. Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. §429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, §429.424(C). By using payment and other codes that conveyed this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.

*Id.* at 2000-2001.

The Supreme Court then turned to the materiality requirements, stating:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-2004.

Turning to the claims here, Mrs. Kietzman's allegations as to falsity and materiality are more than sufficient.[5] In light of this, it is not surprising that Defendant plays games with this Court where Defendant fails to adequately disclose, or even address at all, the allegations that make short work of its arguments. Those dispositive allegations are as follows:

> On or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Mrs. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they billed CMS for the second scan. (Pl.'s Compl. ¶¶ 11, 19). Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several other risk hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 19.
>
> On or about January 29, 2015, Mrs. Morgan advised Mrs. Kietzman that they were still trying to "iron out the treatment planning for CT reads." (Pl.'s Compl. ¶ 23).
>
> Later that day, Mrs. Dozier advised the Cancer Center staff, including Mrs. Kietzman, that its physicians were going to continue to bill for full diagnostic reads for RadPlanning. This was done despite the August, 2014 email from Ms. Combs,

[5] Plaintiff/Relator need not address each and every requirement or practice that is at issue, since a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 2015 U.S. App. LEXIS 21189 (7th Cir. Ind. 2015).

and the response from other hospitals that such procedures were illegal and improper. (Pl.'s Compl. ¶ 24).

On or about the week of January 19, 2015 through January 23, 2015, outside contractor trainers from Siemens USA, with whom KDHS purchased CT scanning equipment, was onsite at KDHS to conduct training. Thereafter, they were onsite to conduct hands-on training with patients the week of February 9, through February 13, 2015. During this second period they were onsite, the Siemens USA trainers questioned the KDHS protocols, and specifically, the medical imaging diagnostic reads for any scans that followed the IDS. Mrs. Meyer was in the room, heard these conversations, and indicated that it was inappropriate and illegal. She further stated that she would turn KDHS into the United States Government, for fraudulent billing, if this practice did not immediately stop. (Pl.'s Compl. ¶ 25).

In an effort to keep her employment, Mrs. Meyer apologized for making the comments to Mrs. Dozier and Mrs. Morgan. Mrs. Kietzman again reiterated that Mrs. Meyer should not be terminated. At that same meeting Mrs. Dozier indicated that the KDHS process of the radiologists conducting and reading the follow up scans was for "best patient care," but that KDHS did not bill for it. While Mrs. Kietzman and Mrs. Meyer were unaware at the time, this statement by Mrs. Dozier concerning the follow up radiology readings was a knowing, intentional lie designed to deflect attention from the ongoing fraudulent scheme being perpetrated by KDHS, Mrs. Dozier, and Mrs. Morgan against the United States Government and others. (Pl.'s Compl. ¶ 31).

On or about February 18, 2015, after the billing mandate by Mrs. Dozier on the billing for review of CT scans, Ms. Heinz advised Mrs. Kietzman that additional charges should not be entered according to the code book. The code book is a reference manual, or more specifically a series of manuals, published by the Federal Government and CMS, which outlines and provides policies and procedures for medical coding for payment by the United States Government. Among other things, it outlines when charges are, and are not, appropriate. Ms. Heinz's statement to Mrs. Kietzman was intended to alert her to the fact that the directive from Mrs. Dozier was illegal. (Pl.'s Compl. ¶ 32).

That same day, at 3:26 p.m., Kim True, the Nuclear Medicine Technologist and PACS Administrator, responded to Ms. Higginbotham's email stating that the current process of the radiologists reading the treatment planning CT scans was approved by Mrs. Dozier per an email dated February 4, 2015. Mrs. Kietzman responded to Ms. True's email at 4:09 p.m., stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them. Mrs. Kietzman's email was sent to everyone on the email chain, including Mrs. Dozier. At 5:30 p.m., Mrs. Dozier replied to Mrs. Kietzman's email stating, "[w]hy would you copy all these people on this question? This is unprofessional." An hour later, at 6:56 p.m., Mrs. Dozier sent another email to Mrs. Kietzman apologizing if the email sounded harsh and stated, "the radiologists are very

> sensitive on this and when we mention charging, they get defensive." (Pl.'s Compl. ¶ 46).
>
> On or about September 16, 2015, Mrs. Morgan requested, by email at 1:05 p.m., that Mrs. Kietzman meet with her to discuss the email exchange from the previous day. Mrs. Kietzman responded and indicated that she was available all day to meet with her. However, Mrs. Morgan never responded back to Mrs. Kietzman to set up a time to meet even though Mrs. Morgan was in the hospital that day. (Pl.'s Compl. ¶ 47).

In terms of pleading a "plausible claim", it is appropriate to ask why, if it was appropriate to render this service and charge for it under the interest of "best patient care," would Mrs. Dozier then lie about the fact that it was being charged, and then cover-up this fact? The answer is obvious. These allegations make clear that not only were these second charges illegal and inappropriate, the inference is that these charges necessitated a cover-up by Mrs. Dozier, to prevent the federal government from learning about the charges at issue, and to ensure the money kept flowing to KDHS.

This is not an issue of a "speculation" by Mrs. Kietzman. These facts, instead, create damning inferences of knowledge of deceit and ongoing false claims – false claims that other hospitals in Indiana would not dare submit for payment – false claims that outside contractors knew were illegal and inappropriate and should not be paid – false claims that the CMS Code Book specifically prohibited – false claims that Mrs. Dozier went berserk over when Mrs. Kietzman even mentioned them in an email – and false claims that Mrs. Dozier and the radiologists were "defensive" and "sensitive" about. Once again, it is a fair question to ask why anyone would get "defensive" and "sensitive" about appropriately billed Medicare charges. The obvious answer is because these providers knew the charges were illegal, inappropriate, not medically necessary, and required a cover up.

These same allegations overcome Defendant's argument as to materiality. People, including Mrs. Dozier, other hospitals, and the radiologists who were "defensive" do not respond the way they did unless the issues are material to the government's decision to pay (and likewise demonstrate knowledge of that materiality). Defendant's arguments about the allegations not being adequate on the issue of materiality are simply baseless.

Defendant's argument about identifying a "particular false claim" is even more specious. First, the Amended Complaint identified a great number of false claims. It stated:

> Since at least January 1, 1999, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. On February 23, 2015, the Cancer Center moved to a new facility. Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. Since at least January 1, 1999, KDHS radiologists would then conduct second full diagnostic read for radiation treatment planning ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary. Since at least January 1, 1999, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads per year; and a significant percentage of these patients were Medicare/Medicaid patients. As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans. (Pl.'s Compl. ¶ 18).
> …

Contrary to Defendant's argument, it is not necessary to identify each and every false claim presented to the government. Thus, Courts have not required a plaintiff to plead each and every false claim presented for payment. The Seventh Circuit noted that "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is

inferential … and the inference that [the relator] proposes is a plausible one." *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 854 (7th Cir. 2009).[6]

Accordingly, it is not necessary to plead the individual transaction details of an actually submitted false claim. Rather, details of the "scheme" is sufficient when coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.4f 180. 190 (5th Cir. 2009).

This Court, in *Abner v. Jewish Hosp. Health Care Servs.*, 2008 U.S. Dist. LEXIS 61985 (SDIN 2008) addressed similar allegations as follows:

> The relators allege that from June to December 2004, and at other times, laboratory manager Paul Pierce at Scott Memorial Hospital issued policy statements and instructed laboratory employees to generate fraudulent Medicare and Medicaid bills. The relators allege that Pierce authorized six types of fraudulent billing practices: (1) submitting Medicare and Medicaid invoices for tests that a physician did not order; (2) submitting Medicare and Medicaid invoices for tests that were not performed; (3) submitting Medicare claims for tests that were not yet completed; (4) substituting claims for services Medicare would not cover for claims for services that Medicare would cover; (5) submitting separate claims for pre-operative [*5] tests; and (6) submitting Medicare claims for tests performed on spoiled blood samples. The relators also allege that defendants' employees falsely certified compliance with Medicare regulations in the billing practices just described.
>
> This Court then explained:
>
> The False Claims Act, in 31 U.S.C. § 3729(a)(1), holds liable anyone who knowingly presents or causes to be presented to the United States a false claim for payment. Subsection 3729(a)(2) holds liable anyone who knowingly makes, uses, or causes to be made or used a false statement to get the government to pay a false claim. In their complaint, the relators do not specify which route they are pursuing, so the court considers both. See generally *Sidney S. Arst Co. v. Pipefitters Welfare Educational Fund*, 25 F.3d 417, 421 (7th Cir. 1994) (reversing dismissal;

[6] Mrs. Kietzman also raised allegations concerning the OB/GYN department and fraudulent billing on radiology reads, based on a meeting she attended where it was apparent such activity was ongoing and the fact it was never corrected. (Pl.'s Compl. ¶¶ 60-62). Thus, there appears to be a culture, starting with the CEO, that not only permits, but encourages fraud to increase the bottom line. (Pl.'s Compl.). She suspects, because of the pattern of behavior she knows of, that the fraud is more widespread than even the OB/GYN and Cancer centers. (Pl.'s Compl. ¶ 63). Unsurprisingly, beyond the Cancer Center and OB/GYN issues, Mrs. Kietzman does not, at present, have more details on the specifics of that fraud, but believes discovery will uncover it.

recognizing that "the district court has a duty to consider whether a plaintiff's allegations could provide relief under any available legal theory").

To establish a claim under subsection 3729(a)(1), the relators must plead with particularity three elements: (1) a false claim (2) which the defendant presented or caused to be presented to the United States for payment (3) knowing that the claim was false. See *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) (affirming dismissal of healthcare fraud claims). To establish a claim under subsection 3729(a)(2), the relators must plead with particularity three elements: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false. *Id.* at 741. Defendants argue here that the relators have not pled their allegations of false billing with particularity because they failed to allege that the claims were actually submitted for payment, failed to submit proof that the claims were actually false, and failed to allege that the defendants knew the claims were false.

First, a principal difference between subsection 3729(a)(1) and subsection 3729(a)(2) is that only subsection 3729(a)(1) requires the relators to allege submission of a claim for payment. See Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 128 S. Ct. 2123, 2129, 170 L. Ed. 2d 1030 (2008) ("While § 3729(a)(1) requires a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government, the concept of presentment is not mentioned in § 3729(a)(2)."). There is some debate about what facts a relator must plead to allege properly a submission under subsection 3729(a)(1).

…

Courts have found adequate indicia of reliability where the relator was instructed to prepare fraudulent bills for services she performed or where the employee worked in the department where the alleged fraudulent billing occurred. See *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (affirming denial of motion to dismiss healthcare fraud claims on Rule 9(b) grounds for failure to explain why relator believed fraudulent claims were ultimately submitted where relator alleged she had personal knowledge of billing for services she rendered and was instructed to code falsely); *Hill v. Morehouse Medical Associates*, 2003 U.S. App. LEXIS 27956, 2003 WL 22019936, at *4 (11th Cir. 2003) [Published in table format at 82 Fed. Appx. 213.] (reversing dismissal of healthcare fraud claims where relator could not identify particular claims submitted but worked in the healthcare provider's billing department, was aware of false claims routinely submitted to the government, and alleged details of the fraudulent billing practices), *cited by Corsello*, 428 F.3d at 1013.

Defendants seem to want to require a relator to be able to present a chart explaining each step (and identifying an actor for each step) that a claim undergoes between its creation in a department and its placement in the mail for payment. Such a

> requirement would go far beyond the protections of Rule 9(b) and would ignore the realities of modern business practices. Under subsection 3729(a)(1), a relator's complaint must describe (not prove) a particular false claim she knows or has reason to know (based on indicia of reliability) that a defendant's agent submitted for payment.

Not surprisingly, this Court denied the motion to dismiss in *Abner*.

Defendant appears to want Mrs. Kietzman to similarly "present a chart". Defendant is wrong. The Complaint herein describes Mrs. Kietzman's role, and, frankly, discusses in great detail a continuous course of conduct, as well as Defendant's knowledge of the false claims. This Complaint is, to be frank, far more robust than the complaint that also stated a qui tam claim in *Abner*.

Defendant then shamelessly argues that the fact it got away with its scheme, without government detection, for a long period of time, means that it should escape liability. It couches this absurd argument in the context of materiality – that the fact the government kept paying the false claims means that the government must have known about the claims (even though it did not), and kept paying anyway. But, all of that presumes facts that are contained nowhere in the allegations, and are, in fact belied by the allegations. If the government knew about the compliance issues and false claims, why would Mrs. Dozier, the radiologists, and everyone else involved go to such efforts to keep hiding the issue? In short, the facts as set forth in the Amended Complaint overcome Defendant's arguments.

As demonstrated, Plaintiff plead sufficient facts to establish the who, what, when, where, and how. *Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903. *See, also, U.S. ex. Rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.* 772 F.3d 1102, 1006 (7th Cir. 2014) (requirement is to identify the misrepresentation, the time, place, and content of the misrepresentation, and the method by

which the misrepresentation was communicated to the Plaintiff). Thus, Defendant's claim that the Complaint is insufficient is utterly baseless.

3. Fraud was plead with particularity

Defendant attempts to recast its same tired, and unsupported arguments when it argues that the fraud was not plead with particularity. As noted, the who, what, when, where, and how were adequately plead, either explicitly, or through allowable inferences from the facts as plead. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (1990). Who submitted the false claims? Defendant. (Pl.'s Compl. ¶ 18). What did they submit? Claims for payment for duplicate, full diagnostic scans for RadPlanning, after an initial scan. *Id.* When? From January 1, 1999, to the present, submitting about 100 of them a year. *Id.* Where? From Defendant's facility, in Southern Indiana, and submitted to Medicare. (Pl.'s Compl. ¶¶ 3, 15-18). How? Through CMS and Medicare billing portals. *Id.*

Defendant then repeats its mantra that the current allegations are not good enough because specific claims must be submitted. In *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009), the Defendant argued that it was incumbent on the Relator to place in its complaint "the specific request for payment." *Id.* But the Seventh Circuit noted that "Lusby has not seen any of the invoices and representations that Rolls-Royce submitted to its customers." *Id.* "He knows about shipments and payments, but he does not have access to the paperwork." *Id.* "The district court held that, unless Lusby has at least one of Rolls-Royce's billing packages, he lacks the required particularity." *Id.*

The Seventh Circuit disagreed, noting that: "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is inferential

… and the inference that [the relator] proposes is a plausible one." 570 F.3d 849, 854. The Court concluded that "[w]e don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit." *Id.* "True, it is essential to show a false statement." *Id.* "But much knowledge is inferential--people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime--and the inference that Lusby proposes is a plausible one." *Id.*

Again, and more recently, in *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 838-839 (7th Cir. 2013), the Seventh Circuit reversed, holding the complaint was sufficient where fraudulent billing practices were alleged, by an employee with knowledge, where the inferences from the factual allegations led to the conclusion that fraudulent claims had been submitted – it was not necessary to identify specifically submitted claims.

And finally, just last year, the Seventh Circuit re-iterated this principle in *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. Wis. 2016). "Considering Ms. Presser's position as a nurse practitioner, a position that does not appear to include regular access to medical bills, we do not see how she would have been able to plead more facts pertaining to the billing process. … We hold, consistent with Lusby and Leveski, that Ms. Presser has alleged adequately that Acacia billed Medicare for services that were provided pursuant to the challenged policies and procedures." *Id.*

Indeed, it is not even necessary to plead the individual transaction details of an actually submitted false claim – rather details of the scheme is sufficient when coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.4f 180. 190 (5th Cir. 2009).

Here, the Amended Complaint identifies numerous false claims. (Pl.'s Compl. ¶18). It indicates that the practice was ongoing. *Id.* It identified the practice of billing for second readings for RadPlanning. *Id.* It noted that the bills would then be submitted to the federal government for payment, after the unnecessary procedure was performed. *Id.* It noted that the reads were in contravention of CMS guidelines and regulations. *Id.* It identified approximately 100 of these improper and unnecessary radiology reads per year. *Id.* And it noted that a significant percentage were Medicare/Medicaid patients. *Id.*

The Amended Complaint also identified that specific patients were being seen when the outside contractors were onsite from Siemens for training – from January 19, 2015 and January 23, 2015, and later from February 9, 2015 through February 13, 2015, that patient treatment was going on, and that the fraudulent billing practices were well underway with patients being treated at that time. *Id.* at ¶ 25. This is sufficient.[7]

Lastly, Defendant complains about the "information and belief" allegations. Three points: (1) Plaintiff was not involved in the back-end coding and billing; she knows about the fraud that was perpetuated, and its details, and can, if she needs to, identify several examples of actual patients; (2) Plaintiff's "information and belief" allegations are limited to *four instances in the entire complaint*, and involve only those functions that she does not have actual knowledge of (i.e. the billing function); and (3) Plaintiff has provided significant amounts of detail to give her "information and belief" the context necessary to provide the grounds for her suspicions and the basis for these statements.

[7] If it is necessary to provide specific examples, of specific patients, for whom RadPlanning imaging was charged at a full rate, Plaintiff is able to do so, and would seek to do so with an amendment. In that event, Plaintiff would propose to identify in such an amendment the dates the services were rendered, identify patients by their initials to avoid HIPAA issues, identify how Plaintiff was able to confirm bills were submitted (she confirmed as much and saw copies of some of the bills, from the billing department and actually saw the bills, but did not remove or copy them for fear of HIPAA issues). We believe the details are sufficient as-is, but are able to provide examples and details, and simply seek guidance on how many examples the Court would like to see and in what detail.

The first "information and belief" statement was the approximate cost of the procedure at issue, as billed to the United States, which the Plaintiff identified as $375 per procedure. (Pl.'s Compl. ¶ 18). Again, Plaintiff was not involved in the billing function and thus was not aware of the exact specific dollar amount, but was aware of general costs, and was able to estimate them based on budgetary and other functions through her job duties. The second "information and belief" statement dealt with the allegations of the OB/GYN fraudulent billing for radiological procedures. (Pl.'s Compl. ¶ 59). Plaintiff identified the basis of her beliefs: meetings that were held where the issues were identified, but not corrected, coupled with her much more specific knowledge of ongoing fraud in relation to the radiologists in the Cancer Center. (Pl.'s Compl. ¶¶ 59-61; Pl.'s Compl.).

The third "information and belief" statement dealt with the knowledge of KDHS of the fraudulent billing for the OB/GYN function, including the knowledge of Mrs. Morgan and Mrs. Dozier. (Pl.'s Compl. ¶62). Again, the Amended Complaint provides the basis for this as well: Mrs. Morgan sat on the committee and had knowledge of the comments at issue in 2007 or 2008, and Mrs. Dozier was well aware of the "sensitivity" of the radiologists to billing issues. (Pl.'s Compl. ¶¶ 59-61; 46).

And the final and fourth "information and belief" statement deals with other suspected fraud, in particular with respect to the radiologists. (Pl.'s Compl. ¶ 62). The basis of such was the fraud in relation to the radiology reads in the Cancer Center, coupled with Mrs. Dozier's statement that the radiologists are "sensitive" about billing, which statement only makes sense if the radiologists are billing improperly. (Pl.'s Compl. ¶ 46). As such, the grounds for Mrs. Kietzman's "information and belief" statements are adequately explained. Defendant's arguments to the contrary are inappropriate.

**D. The FCA Claims are properly plead, and cover the period from January 19, 2010 to the present**

Mrs. Kietzman was not aware, and had no specific information, or even reason to suspect, the fraudulent billing practices at the Cancer Center until, at the earliest, August 1, 2014. (Pl.'s Compl. ¶ 19). Even then, she had no idea that KDHS was illegally billing following that August 1, 2014 email. Events developed slowly, but it is safe to say that the interactions with Siemens in late January and early February, 2015 and the follow up from those interactions put her on notice regarding the potential of fraudulent billing that eventually developed into a confirmation of the practice. (Pl.'s Compl. ¶¶ 20-52).

In any event, Plaintiff agrees that, absent the intervention of the United States, the limitations period is six (6) years. 31 U.S.C. 3731(b). The Amended Complaint, and the claims section specifically, is, admittedly, ambiguous on the period for which relief is sought – and contains no such period. (Pl.'s Compl. ¶¶ 64-69, Prayer for relief).[8] Nevertheless, it was not, and is not, Plaintiff's intent to seek reimbursement and penalties for claims that predate the six-year period from the filing of the Complaint (unless the United States chooses to intervene). Because the Amended Complaint does not specifically seek relief beyond the limitations period, dismissal is not warranted – but the Court can, and should, construe the Amended Complaint consistent with the statute of limitations period.

**E. The Conspiracy Claims are properly plead**

The Amended Complaint notes the following:

> Since at least January 1, 1999, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. On February 23, 2015, the Cancer Center moved to a new facility. Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. Since at least January 1, 1999, KDHS

[8] The statements that practices predated the period at issue was not intended to seek relief for claims outside the limitation period, but rather was a statement of fact outlining when the illegal practices at issue began.

> radiologists would then conduct second full diagnostic read for radiation treatment planning ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary. Since at least January 1, 1999, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads per year; and a significant percentage of these patients were Medicare/Medicaid patients. As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans. (Pl.'s Compl. ¶18).

It also pleads:

> On or about May 7, 2015, a discussion occurred amongst Mrs. Kietzman, Ms. Combs, and Ms. Distel about the billing of fiducial markers by the urologists, who were contractors not employed by KDHS. The urology department desired that the Cancer Center begin to purchase fiducial markers for the urologists to place them. In this meeting, Ms. Distel explained that the KDHS paid for the fiducial markers, but that KDHS received credit for the billing within its budget for the markers and placement. Ms. Combs advised that since the urology department is receiving credit for the billing for the fiducial markers, there were no compliance concerns. However, Mrs. Kietzman voiced her concerns that the KDHS was illegally enticing the urologists to send patients to it since the hospital was paying the urologists, and purchasing the fiducial markers. (Pl.'s Compl. ¶37).

The Amended Complaint specifically notes that the urologists were not employed by KDHS, but were instead independent contractors. It was, admittedly, vague about the employment status of the radiologists. The radiologists, are, in fact, independent contractors. Because the urologists and radiologists are independent contractors, the intra-corporate conspiracy doctrine does not apply to allegations that Defendant conspired with them to carry out the fraud that is alleged. *King's Choice Neckwear, Inc. v. FedEx Corp.*, 2007 U.S. Dist. LEXIS 93843 (D. NJ 2007) (intra-corporate conspiracy doctrine does not apply to conspiracies with independent contractors).

The conspiracy claims should not be dismissed.

### F. The FCA retaliation claim is properly plead

A FCA retaliation claim is properly plead where a Plaintiff alleges: (1) that she acted in furtherance of an FCA enforcement action: (2) that the defendants knew she was engaged in this protected conduct; and (3) that the defendants were motivated, at least in part, to terminate her because of the protected conduct. *See Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002).

In 2009, Congress amended the qui tam retaliation statute dealing with what constitutes protected conduct. The current version of the statute (in place since 2009) states:

> (h) Relief from retaliatory actions.
>
> (1) In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others **in furtherance of an action under this section <u>or other efforts to stop 1 or more violations of this subchapter</u>** [31 USCS §§ 3721 et seq.].
>
> 31 U.S.C. 3730(h)(1) (emphasis added).

Thus, Courts have held, in light of these statutory amendments, that internal complaints are now sufficient under the revised statutory provisions – since they are in furtherance of efforts to stop 1 or more violations. *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 2016 U.S. Dist. LEXIS 121136 (EDNY 2016); *Swanson v. Battery Park City Auth.*, 2016 U.S. Dist. LEXIS 74570 (SDNY 2016).

Because of these 2009 amendments, the Seventh Circuit, and district courts within the Seventh Circuit, have retreated from the 2002 case cited by Defendant – *Brandon v. Anesthesia & Pain Mgmt. Assocs. Ltd.*, 277 F.3d 936 (7th Cir. 2002), that is at the heart of Defendant's arguments.

*Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012); *United States ex rel. Helfer v. Associated Anesthesiologists of Springfield, Ltd.*, 2014 U.S. Dist. LEXIS 117945 (CD Ill. 2014).

Even more deceptively, Defendant cites cases that involve fraud-alert employees – employees specifically tasked with the detection of fraud – for which the Seventh Circuit (before the 2009 amendments) applied a heightened bar for retaliation actions. But there is absolutely nothing in the Amended Complaint that would indicate that Mrs. Kietzman had such duties.[9]

The FCA's anti-retaliation provision "protects employees supplying information that could prompt an investigation or conducting their own internal investigation even where an action is never filed." *Abner v. Jewish Hosp. Health Care Servs.*, 2008 U.S. Dist. LEXIS 61985, *27 (S.D. Ind. 2008). In determining whether an employee's actions are protected under § 3730, a court will consider whether: "'(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (*quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)); *United States v. Indianapolis Neurosurgical Group. Inc.*, 2013 U.S. Dist. LEXIS 23610 *, 2013 WL 652538 (S.D. Ind. Feb. 21, 2013).

In *Fanslow*, the Seventh Circuit noted that the district court erroneously held Fanslow to the heightened notice standard that is reserved for employees who are charged with discovering fraud in the normal course of their job duties. *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469 (7th

[9] The Seventh Circuit Court of Appeals previously instructed that the scope of notice a relator must supply to his employer in order to sustain a retaliation claim depends upon whether the employee is "charged with discovering fraud in the normal course of their job duties." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004). If so, an employee must establish that his employer was aware his actions were in furtherance of a qui tam action. *See Brandon*, 277 F.3d at 944-45 (FCA does not protect employees who simply "raise their concerns privately within their firm or company, rather than publicly," and telling an employer that actions do not comply with Medicare billing regulations is not enough to invoke FCA's protection — an employer must be on notice that the employee believes the employer is violating FCA and is acting in furtherance of qui tam action).

Cir. Ill. 2004). Because he was not a fraud-alert employee, Fanslow had to show only that CMC was aware of his investigation, a point for which there is ample support in the record. *Id.*

Even for so-called fraud-alert employees, the court made it clear in *Fanslow*, 384 F.3d at 484, that the employee need tell his employer only that it is engaging in "illegal" billing practices. *Id.* Other courts have made clear that allegations or the use of the term "illegal" is sufficient to place the employer on notice. *Haka v. Lincoln County*, 533 F. Supp. 2d 895 (WD Wis. 2008).

The Amended Complaint in this matter details Mrs. Kietzman's efforts to protect Mrs. Meyer's employment from retaliation by Mrs. Dozier and Mrs. Morgan following Mrs. Meyer's threat to report the fraudulent billing to the federal government. (Pl.'s Compl. ¶¶ 25-31). It is followed by a later, September 17, 2015 interaction between Mrs. Morgan and Mrs. Kietzman, where "Mrs. Kietzman expressed that people sometimes get emotional for feelings of guilt implying that Mrs. Dozier felt guilty for these practices. Mrs. Morgan responded, '[C]hoose your words very carefully.'" (Pl.'s Compl. ¶ 48). And that interaction was followed by a meeting with Mrs. Dozier wherein Mrs. Kietzman:

> advised Mrs. Dozier that she believed her email was supporting the practice of the radiologists reading CT scans, but not charging for them, since such charges would be illegal. Mrs. Dozier responded that it is "touchy with the radiologists when you talk about money." Mrs. Dozier stated that it seemed that she and Mrs. Kietzman were always on a "different page." Mrs. Dozier additionally told Mrs. Kietzman that Mrs. Kietzman was unprofessional and unsupportive of the organization. She also expressed that she could not trust her. Mrs. Kietzman replied that it was hurtful to hear that, and that she felt as though Mrs. Dozier did not know her because people who did know her would not feel that way. … (Pl.'s Compl. ¶ 50).

On October 5, 2015, Mrs. Kietzman was terminated "due to her opposition to ongoing fraudulent billing of the United States Government, in and within, the Cancer Center." (Pl.'s Compl. ¶ 56). And, "[f]ollowing her termination, Mrs. Kietzman caused a letter to be placed in her file, as of record, that indicated her disagreement with the termination letter, and indicated that

her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by KDHS, and retaliation by Mrs. Dozier and Mrs. Morgan for Mrs. Kietzman not turning her head the other way." (Pl.'s Compl. ¶ 58). Furthermore, Mrs. Kietzman undertook action in furtherance of an enforcement action by repeatedly voicing her concerns regarding fraudulent billing for Medicare. (Pl.'s Compl. ¶ 79). Defendant had knowledge that Mrs. Kietzman was engaged in protected conduct by virtue of its knowledge of Mrs. Kietzman's accusations. (Pl.'s Compl. ¶ 80). Mrs. Kietzman was discharged, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment because of her lawful acts in furtherance of an action under 31 U.S.C. § 3730 as well as other efforts to stop one or more violations of 31 U.S.C. § 3729 and 3730. (Pl.'s Compl. ¶ 81). Mrs. Kietzman's discharge was motivated by her involvement in protected conduct. (Pl.'s Compl. ¶ 82).

Defendant's claims that Mrs. Kietzman's actions were not taken in furtherance of a FCA enforcement action could not be further from the truth. Defendant does not even attempt to address the 2009 amendments to the FCA statute, that now also permits actions for "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. 3730(h)(1).

The opposition to illegal billing practices, statements regarding Mrs. Dozier's "guilt" that were made to Mrs. Morgan mere weeks before the termination, opposition to retaliation against Mrs. Meyer, and ultimately the statement concerning ensuring that there was not any ongoing fraudulent billing for the second scan, made only weeks before the termination, all give rise to an inference that the termination was in response to engaging in protected activity.

Defendant's claims to the contrary run afoul of the liberal pleading standard and plausibility standards of Civ. R. 12(B)(6). The retaliation claim has been adequately plead.

**G. Because the federal claims survive, supplemental jurisdiction is appropriate**

Plaintiff has adequately plead federal claims, and thus the supplemental jurisdiction over the state law claims is also appropriate. 28 U.S.C. 1367(c).

## IV. CONCLUSION

Defendant's Motion to Dismiss should be denied in its entirety. To the extent that this Court is inclined to grant any of it, however, the Court should permit Plaintiff the opportunity to correct any deficiencies in an amended pleading.

Respectfully submitted,

s/Thomas B. Bruns

Thomas B. Bruns (0051212)
BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
Phone: 513-312-9890
Fax: 513-800-1263
tbruns@bcvalaw.com
*Counsel for Plaintiff/Relator, Jessica Kietzman*

Andrew Dutkanych, #23551-49
Krista A. Willike, #32550-10
BIESECKER DUTKANYCH & MACER, LLC
101 N. 7th Street
Louisville, KY 40202
Phone: 502-561-3443
Fax: 502-561-3444
Emails: ad@bdlegal.com
kwillike@bdlegal.com
*Counsel for Plaintiff/Relator, Jessica Kietzman*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2017 a copy of the foregoing was filed via the Court's CM/ECF system, which will provide notice to all counsel.

Rodney L. Scott
Waters, Tyler, Hofman Scott, LLC
1947 East Spring St.
New Albany, IN 47150
rscott@wthslaw.com

Shelese M. Woods
U.S. Attorneys' Office
10 West Market St., Suite 2100
Indianapolis, IN 46204
Shelese.woods@usdoj.gov
Counsel for the United States of America

Michael W. Hawkins
Jennifer Orr Mitchell
Matthew S. Arend
Dinsmore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
michael.hawkins@dinsmore.com
jennifer.mitchell@dinsmore.com
matthew.arend@dinsmore.com

s/Thomas B. Bruns
Thomas B. Bruns (0051212)

Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45202
513-312-9890
513-800-1263 Fax