**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA, ex rel. JESSICA KIETZMAN** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CAUSE NO: 4:16-CV-00009-SEB-DML** |
| **THE BETHANY CIRCLE OF KING'S DAUGHTERS' OF MADISON, INDIANA, INC. d/b/a The King's Daughters' Hospital and Health Services** | ) | |
| **Defendant.** | ) | |

**RESPONSE AND BRIEF IN OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT BY RELATOR/PLAINTIFF JESSICA KIETZMAN**

Jessica Kietzman, by and through Counsel, submits this Response and Brief in Opposition to Defendant's Motion to Dismiss.

## I. INTRODUCTION

Defendant continues its dishonesty directed towards the United States and its officials, as Defendant engages in a misleading and troubling exercise in a futile effort to attempt to obtain dismissal of this matter. It continues to cite this Court to many decisions that do not involve dismissal motions at all – but rather involve summary judgment proceedings. It conflates, misreads, and misrepresents cases that actually stand for the proposition that dismissal is not warranted. It engages in a hyper-technical and strict reading of the Second Amended Complaint in this matter, and fails to draw appropriate inferences from the facts as plead, in contravention of Motion to Dismiss standards.

## II. FACTS

1. <u>The Qui Tam Allegations</u>

Defendant hired Mrs. Kietzman in or about 1999 as a unit secretary, was promoted to a nurse intern in 1999, and later to a staff nurse in 1999, was promoted to a charge nurse in 2000, was promoted to nursing supervisor in 2004. (Pl.'s Second Am. Compl. (Compl.) at ¶ 8). Since 2007, she was promoted to, and has served as the Oncology Service Line Director, supervising and directing the Cancer Center at KDHS ("Cancer Center"). *Id.* From 2007 through 2009, Mrs. Kietzman was also the Women's Service Line Director at KDHS (i.e. covered OB/Gyn, and women's care). *Id.* Mrs. Kietzman is a licensed registered nurse within the State of Indiana. *Id.* Mrs. Kietzman held the position of Director of the Cancer Center until her termination from employment by Defendant on or about October 5, 2015. *Id.* But she did not have compliance or fraud detection duties. *Id.*

Current Procedural Terminology ("CPT") medical code sets are maintained by the American Medical Association through the CPT Editorial Panel. (Pl.'s Compl. ¶ 19). The CPT code set describes medical, surgical, and diagnostic services and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, accreditation organizations, and payers for administrative, financial, and analytical purposes. *Id.* The CPT code identifies the services rendered rather than the diagnosis on the claim. *Id.* CPT codes are identified and utilized by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that handles claims for payment for hospital and medical services to patients for payment by the United States government. *Id.*

When a Medicare claim is submitted, it processes through a series of edits in the Fiscal Intermediary Standard System to ensure that the information provided is complete and correct.

(Pl.'s Compl. ¶ 20). If the claim is deemed incomplete or incorrect, it is sent to a return to provider ("RTP") file. *Id.* Thus, improper claims that do not meet standards are not paid.

Since at least January 1, 1999, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. (Pl.'s Compl. ¶22). On February 23, 2015, the Cancer Center moved to a new facility. *Id.* at ¶23. Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. *Id.* Since at least January 1, 1999, KDHS radiologists would then conduct second full diagnostic read for radiation treatment planning ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary. *Id.*

Since at least January 1, 1999, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. *Id.* at ¶24. Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads per year; and a significant percentage of these patients were Medicare/Medicaid patients. *Id.* As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans. *Id.*

The United States would not have paid these claims for unnecessary radiology reads, had it known that such procedures were unnecessary. *Id.* at ¶25. The false certifications and false submissions by KDHS directly, or through authorized agents, contractors, or others, were material to the United States. *Id.* The Defendant knowingly presented, or caused to be presented, to the United States numerous false claims, for each of these improper and unnecessary radiology reads, from January 19, 2010 to the present, as a means of illegally increasing the revenue of KDHS and

the revenue of the independent contractor radiologists. *Id.* at ¶26. The impropriety and illegal of these submittals was known to Lisa Morgan, from January 2010 to the present, and Carol Dozier, from at least July, 2013 to the present. *Id.* at ¶27.

On or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Ms. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they billed CMS for the second scan. (Pl.'s Compl. ¶¶ 15, 28). Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several other risk hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 28. That e-mail demonstrates scienter, intent, and knowledge by Defendant about the issue – and yet Defendant persisted with its illegal conduct after August, 2014.

On or about January 29, 2015, Mrs. Dozier advised the Cancer Center staff, including Mrs. Kietzman, that its physicians were going to continue to bill for full diagnostic reads for RadPlanning. (Pl.'s Compl. ¶ 24). This was done despite the August, 2014 e-mail from Ms. Combs, and the response from other hospitals that such procedures were illegal and improper.

Additional communications related to the illegal charges occurred throughout late 2014 and early 2015. (Pl.'s Compl. ¶¶ 29-58). These same communications evince an intent to present knowingly false claims to the federal government. *Id.* There was further follow ups on this issue up until Mrs. Kietzman's termination. *Id.*

The actions of September, 2015, however, wherein additional questions regarding the follow up billing (which occurred into 2015), demonstrate an extremely aggressive and unwarranted response by Carol Dozier and Lisa Morgan (another high-level hospital employee)

towards discussion of the codes at issue. (Pl.'s Compl. ¶¶ 56-72). These allegations demonstrate the continued presentment of knowingly false claims to the United States. *Id.* Additional detail follows regarding what appears to be, and the evidence suggests were in fact, illegal radiology billings from the OB department. (Pl.'s Compl. ¶¶ 59-72).

Plaintiff has plead that Defendant knowingly presented or caused false or fraudulent claims to be submitted to Medicare for reimbursement. (Pl.'s Compl. ¶¶ 73-76). Medicare is an agency of the United States Department of Health and Human Services, which is a department within the Government of the United States of America. (Pl.'s Compl. ¶ 81). Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. (Pl.'s Compl. ¶ 82). And Defendant intentionally and willfully presented or caused a false claim to be presented to the United States of America in violation of 31 U.S.C. § 3729(a). (Pl.'s Compl. ¶ 84).

2. <u>The Retaliation Allegations</u>

Defendant hired Mrs. Kietzman in or about 1999 as a unit secretary, was promoted to a nurse intern in 1999, and later to a staff nurse in 1999, was promoted to a charge nurse in 2000, was promoted to nursing supervisor in 2004. (Pl.'s Compl. ¶ 8). Since 2007, she was promoted to, and has served as the Oncology Service Line Director, supervising and directing the Cancer Center at KDHS ("Cancer Center"). *Id.* From 2007 through 2009, Mrs. Kietzman was also the Women's Service Line Director at KDHS (i.e. covered OB/Gyn, and women's care). *Id.* Mrs. Kietzman is a licensed registered nurse within the State of Indiana. *Id.* Mrs. Kietzman held the position of Director of the Cancer Center until her termination from employment by Defendant on or about October 5, 2015. *Id.*

On or about the week of January 19, 2015 through January 23, 2015, outside contractor trainers from Siemens USA, with whom KDHS purchased CT scanning equipment, was onsite at KDHS to conduct training. (Pl.'s Compl. ¶ 36). Thereafter, they were onsite to conduct hands-on training with patients the week of February 9, through February 13, 2015. *Id.* During this second period they were onsite, the Siemens USA trainers questioned the KDHS protocols, and specifically, the medical imaging diagnostic reads for any scans that followed the IDS. *Id.* Mrs. Meyer was in the room, heard these conversations, and indicated that it was inappropriate and illegal. She further stated that she would turn KDHS into the United States Government, for fraudulent billing, if this practice did not immediately stop. *Id.*

On February 12, 2015, Jo Purvis informed Mrs. Kietzman via e-mail about Mrs. Meyer's "inappropriate" comments about the fraudulent billing. (Pl.'s Compl. ¶ 38). She copied Mrs. Dozier and Susan Poling, the Human Resources Director on that e-mail. *Id.* Following the Purvis email, Mrs. Morgan approached Mrs. Kietzman, and confirmed Mrs. Meyer's comments about the fraudulent billing, and advised that Mrs. Dozier intended to terminate Mrs. Meyer's employment as a result of the comments. (Pl.'s Compl. ¶ 39). Mrs. Kietzman indicated to Mrs. Morgan that it was inappropriate and would be detrimental to the Cancer Center to terminate Mrs. Meyer's employment. (Pl.'s Compl. ¶40). As such, Mrs. Kietzman requested to join Mrs. Meyer in a meeting with Mrs. Morgan and Mrs. Dozier. *Id.*

This meeting occurred on February 15, 2015, in which a detailed discussion occurred about radiation treatment planning CT, documentation, billing and charges. (Pl.'s Compl. ¶ 41). Mrs. Dozier told Mrs. Meyer that her comments were inappropriate, and that she would not tolerate anyone who threatened to report any of KDHS' practices to the federal government, nor would she permit anyone who did so to remain employed by KDHS. *Id.*

In an effort to keep her employment, Mrs. Meyer apologized for making the comments to Mrs. Dozier and Mrs. Morgan. (Pl.'s Compl. ¶ 42). Mrs. Kietzman again reiterated that Mrs. Meyer should not be terminated. *Id.* At that same meeting, Mrs. Dozier indicated that the KDHS process of the radiologists conducting and reading the follow up scans was for "best patient care," but that KDHS did not bill for it. *Id.* While Mrs. Kietzman and Mrs. Meyer were unaware at the time, this statement by Mrs. Dozier concerning the follow up radiology readings was a knowing, intentional lie designed to deflect attention from the ongoing fraudulent scheme being perpetrated by KDHS, Mrs. Dozier, and Mrs. Morgan against the United States Government and others. *Id.*

On September 15, 2015, at 3:26 p.m., Kim True, the Nuclear Medicine Technologist and PACS Administrator, responded to Ms. Higginbotham's email stating that the current process of the radiologists reading the treatment planning CT scans was approved by Ms. Dozier per an email dated February 4, 2015. (Pl.'s Compl. ¶ 58). Mrs. Kietzman responded to Ms. True's email at 4:09 p.m., stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them. *Id.* Mrs. Kietzman's email was sent to everyone on the email chain, including Mrs. Dozier. *Id.* At 5:30 p.m., Mrs. Dozier replied to Mrs. Kietzman's email stating, "[w]hy would you copy all these people on this question? This is unprofessional." *Id.* An hour later, at 6:56 p.m., Mrs. Dozier sent another email to Mrs. Kietzman apologizing if the email sounded harsh and stated, "the radiologists are very sensitive on this and when we mention charging, they get defensive." *Id.*

Mrs. Morgan met with Mrs. Kietzman, early in the morning, on or about September 17, 2015 to discuss the email exchange from September 15, 2015. (Pl.'s Compl. ¶ 61). Mrs. Morgan advised Mrs. Kietzman that she should have been at Mrs. Dozier's door first thing yesterday morning apologizing for her actions. *Id.* Mrs. Kietzman responded that she was unclear why Mrs.

Dozier was so upset with her. Mrs. Kietzman reiterated that her email simply expressed that the radiologists were reading the tests for good patient care, but would not charge for it. *Id.* Mrs. Morgan responded that Mrs. Kietzman was being "disrespectful," and she needed to make the situation "right" with Mrs. Dozier. *Id.* Mrs. Kietzman again reiterated that her email supported what Mrs. Dozier said was the Cancer Center's practice. *Id.* Mrs. Kietzman additionally advised Mrs. Morgan that she was uncomfortable with the fact that Mrs. Dozier was so upset with her for supporting her statement to others involved in the process. *Id.* She also stated that she found it interesting that Mrs. Dozier apologized an hour later for her email. *Id.* Mrs. Kietzman expressed that people sometimes get emotional for feelings of guilt implying that Mrs. Dozier felt guilty for these practices and that Mrs. Kietzman was considering reporting the matter to the federal government. Mrs. Morgan responded, "[C]hoose your words very carefully." *Id.*

Later in the day on September 17, 2015, Mrs. Dozier requested a meeting with Mrs. Kietzman and Mrs. Morgan. (Pl.'s Compl. ¶ 63). Mrs. Kietzman advised Ms. Dozier that she believed her email was supporting the practice of the radiologists reading CT scans, but not charging for them, since such charges would be illegal. *Id.* Mrs. Kietzman noted that if the billing were occurring, she would need to report it to the federal government. Mrs. Dozier responded that it is "touchy with the radiologists when you talk about money." *Id.* Mrs. Dozier additionally told Mrs. Kietzman that she was unprofessional and unsupportive of the organization. *Id.* She also expressed that she could not trust her. *Id.*

Notwithstanding the largely pretextual contents of the letter, the cause of Mrs. Kietzman's termination was due to her opposition to ongoing fraudulent billing of the United States Government, in and within, the Cancer Center. (Pl.'s Compl. ¶ 70). Following her termination, Mrs. Kietzman caused a letter to be placed in her file, as of record, that indicated her disagreement

with the letter, and indicated that her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by KDHS, and retaliation by Mrs. Dozier and Mrs. Morgan for Mrs. Kietzman not turning her head the other way. (Pl.'s Compl. ¶ 72).

## III. LAW AND ARGUMENT

### A. Motion to Dismiss Standard

To survive a motion to dismiss, the plaintiffs' complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While specific facts are not necessary, *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam), the complaint must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (omission in original), *quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). And, this Court "must accept as true all of the factual allegations contained in the complaint." *Id.* at 572.

The Court must determine if the allegations in the complaint state a plausible claim for relief. *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level ... ." *Twombly*, 550 U.S. at 555; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (plausibility requirement "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations"), *quoting Twombly*, 550 U.S. at 556.

The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, *quoting Twombly*, 550 U.S. at 556. A claim should survive a Rule 12(b)(6) motion to dismiss if the

complaint contains well-pled facts—that is, not just legal conclusions—that permit the court to infer more than the mere possibility of misconduct. *Iqbal*, 556 U.S. at 679. In deciding or reviewing a Rule 12(b)(6) motion, a court does not ask did these things happen; instead, "the proper question to ask is still 'could these things have happened." *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 827 (7th Cir. 2014), *quoting Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010).

A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 2015 U.S. App. LEXIS 21189 (7th Cir. Ind. 2015).

The False Claims Act ("FCA") does involve claims of fraud, and the heightened pleading standard of Rule 9(b) must be met. *United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).[1] That requires pleading the who, what, when, where, and how. *Id.* It is not necessary to identify each and every (or even any particular) false claim presented to the government – and Courts have thus not required a plaintiff to plead each and every false claim presented for payment. The Seventh Circuit noted that "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is inferential" and provided the inferences based on the facts are plausible, the claim will survive. *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 854 (7th Cir. 2009); *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016)

[1] Compliance with Rule 9 is not required of the retaliation claim. *United States ex. rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004).

Indeed, it is not even necessary to plead the details of an actually submitted false claim – rather details of the scheme is sufficient coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).[2]

Finally, in terms of scienter, [a]lthough Rule 9(b) does not require 'particularity' with respect to the [defendant's] mental state, the complaint must still afford a basis for believe that [the plaintiff] could prove scienter." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990).

**B. In the event that Defendant's Motion is granted, in full, or in part, Plaintiff should be given the opportunity to amend**

At the outset, and as set forth in greater detail in this response, Plaintiff believes that the Second Amended Complaint is sufficient to survive dismissal. But even if it is somehow inadequate, Seventh Circuit case law is clear that Plaintiff should be permitted at least one opportunity to amend following a decision on a motion to dismiss, to correct any deficiencies. *See, e.g., Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success."), *citing Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008); *Olson v. Champaign Cnty.*, 784 F.3d 1093, 2015 U.S. App. LEXIS 7143 (7th Cir. 2015). If this Court rules dismissal is appropriate, Plaintiff should be given at least one opportunity to amend after this Court rules.

[2] Here, of course, if the Court believes that Mrs. Kietzman must identify specific patients who were involved in the allegations at issue, for whom false claims were submitted to the United States concerning treatment in the Cancer Center, she can identify several, but is appropriately concerned about HIPAA in the context of such allegations and disclosures in a unsealed Amended Complaint. She respectfully requests guidance from this Court, due to the issues and Hobson's choice such issues present.

**C. The FCA Claim is adequately plead**

1. Scienter, falsity, and materiality are adequately plead

Defendant argues that Plaintiff has failed to properly plead her claims regarding objective falsity and that such issues were predicated, instead, on her own beliefs. (Brief, RE#67, at 9-10).

Not so. As noted in the factual section above, Plaintiff has plead sufficient facts to establish the who, what, when, where, and how. *Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903. *See, also, U.S. ex. Rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.* 772 F.3d 1102, 1006 (7th Cir. 2014) (requirement is to identify the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the Plaintiff).

As an aside, in *Universal Health Servs. v. United States ex. rel. Escobar*, 136 S.Ct. 1989 (2016), the United States Supreme Court adopted the implied certification theory. "According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment." *Id.* at 1995. "But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under §3729(a)(1)(A)." *Id.* The Supreme Court held: "that, at least in certain circumstances, the implied false certification theory can be a basis for liability." *Id.* "Specifically, liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.* "In these circumstances, liability may attach if the omission renders those representations misleading." *Id.*

*Escobar* involved a case involving alleged Medicare/Medicaid payment submissions, utilizing payment codes. *Id.* at 1997. It also involved allegations of non-qualified providers providing services. *Id.* The Supreme Court then concluded that:

> So too here, by submitting claims for payment using payment codes that corresponded to specific counseling services, Universal Health represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover, Arbour staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context. Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. §429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, §429.424(C). By using payment and other codes that conveyed this information without disclosing Arbour's many violations of basic staff and licensing requirements for mental health facilities, Universal Health's claims constituted misrepresentations.

*Id.* at 2000-2001.

The Supreme Court then turned to the materiality requirements, stating:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-2004.

Turning to the claims in this case, the allegations are more than sufficient.[3] Defendant ignores the significant evidence that establishes scienter for the ongoing fraud at KDHS. For instance, with respect to the second readings on the radiology imaging in the cancer center, the allegations are that: [o]n or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Ms. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they billed CMS for the second scan. (Pl.'s Compl. ¶¶ 15, 28). Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several other risk hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 29. That e-mail demonstrates scienter, intent, and knowledge by Defendant about the issue – and yet Defendant persisted with its illegal conduct after August, 2014.

The FCA's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Universal Health Servs.*, 136 S. Ct. at 1996 (quoting 31 U.S.C. § 3729(b)(1)(A)). Unlike the other elements of an FCA claim, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 658 (7th Cir. 2015). *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, (7th Cir. 2016). Scienter is adequately plead.

---

[3] Plaintiff/Relator need not address each and every requirement or practice that is at issue, since a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 2015 U.S. App. LEXIS 21189 (7th Cir. Ind. 2015).

Defendant plays games with this Court when it fails to adequately disclose, or even address, the allegations that make short work of its arguments in support of its motion to dismiss.

On the IDS, the allegations were:

> On or about August 1, 2014 (or within the few days preceding that date), Ms. Combs (Defendant's Director of Risk Management, Patient Safety and Compliance, who reported to Ms. Dozier, Defendant's CEO) sent emails out to all the Indiana hospitals that participated in the same risk retention group as KDHS, inquiring into whether they billed CMS for the second scan. (Pl.'s Compl. ¶¶ 15, 28). Every hospital responded within a week of August 1, 2014, that they did not bill CMS for the second scan, with several other risk hospitals informing Ms. Combs that such a procedure was illegal, improper, and against CMS rules and regulations. *Id.* at ¶ 28.
>
> On or about January 29, 2015, Mrs. Morgan advised Mrs. Kietzman that they were still trying to "iron out the treatment planning for CT reads." (Pl.'s Compl. ¶ 33).
>
> Later that day, Mrs. Dozier advised the Cancer Center staff, including Mrs. Kietzman, that its physicians were going to continue to bill for full diagnostic reads for RadPlanning. This was done despite the August, 2014 e-mail from Ms. Combs, and the response from other hospitals that such procedures were illegal and improper. (Pl.'s Compl. ¶ 34).
>
> On or about the week of January 19, 2015 through January 23, 2015, outside contractor trainers from Siemens USA, with whom KDHS purchased CT scanning equipment, was onsite at KDHS to conduct training. Thereafter, they were onsite to conduct hands-on training with patients the week of February 9, through February 13, 2015. During this second period they were onsite, the Siemens USA trainers questioned the KDHS protocols, and specifically, the medical imaging diagnostic reads for any scans that followed the IDS. Mrs. Meyer was in the room, heard these conversations, and indicated that it was inappropriate and illegal. She further stated that she would turn KDHS into the United States Government, for fraudulent billing, if this practice did not immediately stop. (Pl.'s Compl. ¶ 36).
>
> In an effort to keep her employment, Mrs. Meyer apologized for making the comments to Mrs. Dozier and Mrs. Morgan. Mrs. Kietzman again reiterated that Mrs. Meyer should not be terminated. At that same meeting Mrs. Dozier indicated that the KDHS process of the radiologists conducting and reading the follow up scans was for "best patient care," but that KDHS did not bill for it. While Mrs. Kietzman and Mrs. Meyer were unaware at the time, this statement by Mrs. Dozier concerning the follow up radiology readings was a knowing, intentional lie designed to deflect attention from the ongoing fraudulent scheme being perpetrated by KDHS, Mrs. Dozier, and Mrs. Morgan against the United States Government and others. (Pl.'s Compl. ¶ 42).

> On or about February 18, 2015, after the billing mandate by Mrs. Dozier on the billing for review of CT scans, Ms. Heinz advised Mrs. Kietzman that additional charges should not be entered according the code book. The code book is a reference manual, or more specifically a series of manuals, published by the Federal Government and CMS, which outlines and provides policies and procedures for medical coding for payment by the United States Government. Among other things, it outlines when charges are, and are not, appropriate. Ms. Heinz's statement to Mrs. Kietzman was intended to alert her to the fact that the directive from Mrs. Dozier was illegal. (Pl.'s Compl. ¶ 43).
>
> [On September 15, 2015], at 3:26 p.m., Kim True, the Nuclear Medicine Technologist and PACS Administrator, responded to Ms. Higginbotham's email stating that the current process of the radiologists reading the treatment planning CT scans was approved by Ms. Dozier per an email dated February 4, 2015. Mrs. Kietzman responded to Ms. True's email at 4:09 p.m., stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them. Mrs. Kietzman's email was sent to everyone on the email chain, including Mrs. Dozier. At 5:30 p.m., Mrs. Dozier replied to Mrs. Kietzman's email stating, "[w]hy would you copy all these people on this question? This is unprofessional." An hour later, at 6:56 p.m., Mrs. Dozier sent another email to Mrs. Kietzman apologizing if the email sounded harsh and stated, "the radiologists are very sensitive on this and when we mention charging, they get defensive." (Pl.'s Compl. ¶ 56).
>
> On or about September 16, 2015, Mrs. Morgan requested, by e-mail at 1:05 p.m., that Mrs. Kietzman meet with her to discuss the email exchange from the previous day. Mrs. Kietzman responded and indicated that she was available all day to meet with her. However, Ms. Morgan never responded back to Mrs. Kietzman to set up a time to meet even though Mrs. Morgan was in the hospital that day. (Pl.'s Compl. ¶ 60).

If it were appropriate to make this charge for "best patient care," why, pray tell, would Dozier lie about the fact that it was not being charged, when in fact it was?

These allegations make clear that not only were these second charges illegal and inappropriate, the inference, and the allegations themselves, make clear that these charges necessitated a cover-up by Dozier, to prevent the federal government from learning about the charges at issue, and to ensure the money kept flowing to KDHS.

This is not an issue of a "judgment call" by Mrs. Kietzman. These facts, instead, create damning inferences of knowledge of deceit and ongoing false claims – false claims that other

hospitals in Indiana would not dare submit for payment – false claims that outside contractors knew were illegal and inappropriate and would not be paid – false claims that the CMS Code Book specifically prohibited – false claims that Dozier went berserk over Mrs. Kietzman mentioned them in an e-mail – and false claims that Dozier and the radiologists were "defensive" about – because they knew they were illegal, inappropriate, not medically necessary, and required a cover up. These same issues overcome materiality. People, including Dozier, other hospitals, and the radiologists who are "sensitive" do not have the reactions at issue, unless the issues are material to the government's decision to pay (and likewise demonstrate knowledge of that materiality). Defendant's arguments about the allegations not being adequate are baseless.

Next, Defendant curiously opines that Plaintiff/Relator failed to provide a link between the fraud and the false claims, and failed to allege any false or fraudulent claim that was submitted. (Brief, RE#67, at 10-12). These arguments about identifying a "particular false claim" is even more specious, and, frankly, unsupported given the allegations at issue and applicable Seventh Circuit case law. First, the Second Amended Complaint identified a great number of false claims. It stated:

> Since at least January 19, 2010, the radiologists within KDHS would conduct an initial diagnostic scan ("IDS") on oncology patients. The radiologists are not employees of KDHS, but are instead independent contractors with privileges at KDHS, who, among other things, are compensated by KDHS at least in part on the number of procedures ordered and performed. (Pl.'s Compl. ¶ 22). On February 23, 2015, the Cancer Center moved to a new facility. Prior to the new Cancer Center's opening on February 23, 2015, all patient radiological diagnosis and imaging was conducted in the radiology department at KDHS. Since at least January 1, 1999, KDHS radiologists would then conduct second full diagnostic read for radiation treatment planning ("RadPlanning"), typically within a short period of time (i.e. two weeks) of the IDS, which was improper and unnecessary. Since at least January 19, 2010, KDHS, either directly, or through agents, contractors, or others would then bill CMS for this second unnecessary scan, which was in contravention of CMS guidelines and regulations. (Pl.'s Compl. ¶ 23). Upon information and belief, the charge was approximately $375 per procedure; KDHS performed approximately 100 of these improper and unnecessary radiology reads

> per year; and a significant percentage of these patients were Medicare/Medicaid patients. As such, KDHS, directly, or through authorized agents, contractors, or others improperly billed the United States significant amounts, to be determined after discovery and trial, for these second unnecessary scans. (Pl.'s Compl. ¶ 24).
> …

The Second Amended Complaint likewise noted that: "In connection with each claim submitted to Medicare and the United States for payment, a provider, such as KDHS, is required to, and does, make certain certifications, including certifications that the procedure in question was in compliance with CMS rules, regulations, and guidelines." (Pl.'s Compl. ¶ 20).

It is not necessary to identify each and every false claim presented to the government – and Courts have thus not required a plaintiff to plead each and every false claim presented for payment. The Seventh Circuit noted that "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is inferential … and the inference that [the relator] proposes is a plausible one." *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 854 (7th Cir. 2009).[4]

Indeed, it is not even necessary to plead the individual transaction details of an actually submitted false claim – rather details of the scheme is sufficient coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.4f 180. 190 (5th Cir. 2009).

[4] Plaintiff/Relator also raised allegations concerning the OB/GYN department and fraudulent billing based on radiology reads, based on a meeting she attended where it was apparent such activity was ongoing and the fact it was never corrected. (Pl.'s Compl. ¶¶ 73-76). Along with the fact that there appears to be a culture, starting with the CEO, that not only permits, but encourages fraud to increase the bottom line. (Pl.'s Compl.). She suspects, because of the pattern of behavior, that the fraud is more widespread than even the OB/GYN and Cancer centers. (Pl.'s Compl. ¶ 77). We anticipate uncovering wide scale fraud in discovery. Unsurprisingly, beyond the Cancer Center and OB/GYN issues, Mrs. Kietzman does not, at present, have more details on the specifics of that fraud, but believes discovery will uncover it.

This Court, in *Abner v. Jewish Hosp. Health Care Servs.*, 2008 U.S. Dist. LEXIS 61985 (SDIN 2008) addressed similar arguments to those made by Relator in this matter. In that case, the relators alleged:

> The relators allege that from June to December 2004, and at other times, laboratory manager Paul Pierce at Scott Memorial Hospital issued policy statements and instructed laboratory employees to generate fraudulent Medicare and Medicaid bills. The relators allege that Pierce authorized six types of fraudulent billing practices: (1) submitting Medicare and Medicaid invoices for tests that a physician did not order; (2) submitting Medicare and Medicaid invoices for tests that were not performed; (3) submitting Medicare claims for tests that were not yet completed; (4) substituting claims for services Medicare would not cover for claims for services that Medicare would cover; (5) submitting separate claims for pre-operative tests; and (6) submitting Medicare claims for tests performed on spoiled blood samples. The relators also allege that defendants' employees falsely certified compliance with Medicare regulations in the billing practices just described.

This Court then explained:

> To establish a claim under subsection 3729(a)(1), the relators must plead with particularity three elements: (1) a false claim (2) which the defendant presented or caused to be presented to the United States for payment (3) knowing that the claim was false. See *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007) (affirming dismissal of healthcare fraud claims). To establish a claim under subsection 3729(a)(2), the relators must plead with particularity three elements: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false. *Id.* at 741. Defendants argue here that the relators have not pled their allegations of false billing with particularity because they failed to allege that the claims were actually submitted for payment, failed to submit proof that the claims were actually false, and failed to allege that the defendants knew the claims were false.
>
> First, a principal difference between subsection 3729(a)(1) and subsection 3729(a)(2) is that only subsection 3729(a)(1) requires the relators to allege submission of a claim for payment. See *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S. Ct. 2123, 2129, 170 L. Ed. 2d 1030 (2008) ("While § 3729(a)(1) requires a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government, the concept of presentment is not mentioned in § 3729(a)(2)."). There is some debate about what facts a relator must plead to allege properly a submission under subsection 3729(a)(1).
>
> …

> Courts have found adequate indicia of reliability where the relator was instructed to prepare fraudulent bills for services she performed or where the employee worked in the department where the alleged fraudulent billing occurred. See *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (affirming denial of motion to dismiss healthcare fraud claims on Rule 9(b) grounds for failure to explain why relator believed fraudulent claims were ultimately submitted where relator alleged she had personal knowledge of billing for services she rendered and was instructed to code falsely); *Hill v. Morehouse Medical Associates*, 2003 U.S. App. LEXIS 27956, 2003 WL 22019936, at *4 (11th Cir. 2003) [Published in table format at 82 Fed. Appx. 213.] (reversing dismissal of healthcare fraud claims where relator could not identify particular claims submitted but worked in the healthcare provider's billing department, was aware of false claims routinely submitted to the government, and alleged details of the fraudulent billing practices), *cited by Corsello*, 428 F.3d at 1013.
>
> Defendants seem to want to require a relator to be able to present a chart explaining each step (and identifying an actor for each step) that a claim undergoes between its creation in a department and its placement in the mail for payment. Such a requirement would go far beyond the protections of Rule 9(b) and would ignore the realities of modern business practices. Under subsection 3729(a)(1), a relator's complaint must describe (not prove) a particular false claim she knows or has reason to know (based on indicia of reliability) that a defendant's agent submitted for payment.
>
> This Court thus denied the motion to dismiss.

Defendant in this matter appears to take the same baseless and rejected tract the Defendant in *Abner* took. In short, the Complaint describes Mrs. Kietzman's role and discusses in great detail a continuous course of conduct, as well as the Defendant's knowledge of the false claims. This Complaint is far more robust than the complaint that stated a claim in *Abner*.

Defendant next argues that scienter is inadequately plead, pointing solely to two issues: the fiducial marker issue and the urologists, and the meaningful use mandate. (Brief, RE#67, at 13-14).

Turning to the two issues that Defendant attacks scienter on, first, as respects the fiducial markers, the allegations were as follows:

> In approximately mid-April, 2015, Mrs. Kietzman identified another compliance concern to Mrs. Morgan and Mrs. Hallgarth about the billing and placement of

> fiducial markers. The placement of interstitial devices for radiation therapy (i.e. fiducial markers and dosimeter) are billed to Medicare for providing services for implantable tissue markers to Medicare beneficiaries. They told Mrs. Kietzman to discuss the issue with Ms. Distel and Ms. Combs, since they did not want to discuss any sort of compliance issue. (Pl.'s Compl. ¶ 47).
>
> On or about May 7, 2015, a discussion occurred amongst Mrs. Kietzman, Ms. Combs, and Ms. Distel about the billing of fiducial markers by the urologists, who were contractors not employed by KDHS. The urology department desired that the Cancer Center begin to purchase fiducial markers for the urologists to place them. In this meeting, Ms. Distel explained that the KDHS paid for the fiducial markers, but that KDHS received credit for the billing within its budget for the markers and placement. Ms. Combs advised that since the urology department is receiving credit for the billing for the fiducial markers, there were no compliance concerns. However, Mrs. Kietzman voiced her concerns that the KDHS was illegally enticing the urologists to send patients to it since the hospital was paying the urologists, and purchasing the fiducial markers. (Pl.'s Compl. ¶ 48).

The fact that the urologists were, as independent contractors, being paid a kickback on the fiducial markers placed by the urologists (a concern that was not alleviated by the fact that the hospital was being reimbursed for its costs for the markers), was never addressed by Distel. Defendant's arguments in this regard about Distel's response does not negate intent and *scienter* – rather, the failure to address the inducement/kickback allegation by Distel raises an inference that Defendant was acting with the requisite *scienter*. Bringing something to the attention of KDHS' compliance professionals, and being told that they did not want to discuss it, raises a clear and unmistakable inference sufficient to establish scienter, false claims, and materiality. Nor is it sufficient that Ms. Kietzman was given a "brush off" by Distel. The anti-kickback provisions contained in 42 U.S.C. 1320a-7b(b) were triggered by this arrangement. Broadly, that section makes it illegal for independent contractors to receive any benefit or payment, in exchange for referrals, as well as "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. 1320a-7b(b)(1)(B); 42

U.S.C. 1320a-7b(b)(2)(B). The fact that the physicians at issue were paid on a per-procedure basis for placing the markers by KDHS, made the arrangement illegal; it matters not that the hospital billed, and received payment, for the markers themselves. This is not Jessica Kietzman's opinion – it is a matter of black letter federal law.

The second issue that Defendant make specific claims are the meaningful use mandate. (Brief, RE#67, at 13-14). The allegations were:

> In or about June 20, 2015, the electronic record system went live for the Cancer Center. Around that same time, Mrs. Kietzman informed Mrs. Morgan that in order to comply with the "meaningful use" mandate, only physicians should have access to, and be entering orders into the electronic medical system, with appropriate documentation. According to CMS, order entry for radiology orders must be directly entered by a licensed healthcare professional. This requirement falls under the "meaningful use" mandate set by CMS. Mrs. Morgan replied that they needed to help the physicians "get where they needed to be." Mrs. Kietzman responded that it would be inappropriate to do so. From at least June 20, 2015 to the present, KDHS fraudulently and knowingly submitted invoices to the United States for payment, which were submitted based on orders entered by non-physicians and non-credentialed medical assistants. Had the United States been aware of this violation of the meaningful use mandate, it would not have paid the claims for services and procedures conducted in violation of the "meaningful use" mandate to KDHS; thus, the absence of such disclosure of non-compliance with the meaningful use mandate, to the United States, by KDHS, which was required, by KDHS was a materially false statement. Furthermore, KDHS made repeated false and material certifications to the United States from January 19, 2010 to the present, in connection of its presentment of numerous claims to the United States, that it was in compliance with federal standards, when in fact it was not. Had KDHS accurately informed the United States of its practices, the United States would not have paid the claims in question. (Pl.'s Compl. ¶ 50).
>
> In or about mid-July, 2015, Mrs. Kietzman underwent a surgery and was off work for approximately two weeks. During that time, Mrs. Morgan knowingly and illegally assigned a nurse to perform physician documentation and entry. Mrs. Morgan and Mrs. Dozier also knowingly and illegally assigned physicians who did not meet "supervising provider" criteria to perform those roles. Upon her return from medical leave, Mrs. Kietzman raised serious concerns about the "supervising provider" issue with Mrs. Dozier and Mrs. Morgan. (Pl.'s Compl. ¶ 52).
>
> On or about August 19, 2015, upon discovering that some nurses, the office coordinator, and a pharmacist for the Cancer Center were performing order entry and documentation, Mrs. Kietzman advised Mrs. Morgan that no one other than a

> physician could perform those duties. This practice did not comply with "meaningful use" mandate. (Pl.'s Compl. ¶ 53).

Defendant cites, as support for its lack of scienter, a cryptic response, in response to an unrelated matter found in paragraph 42:

> On or about August 27, 2015, Ms. Gosman advised the Cancer Center (including but not limited to, Mrs. Kietzman, Ms. Higginbotham, Ms. Yager, Ms. Hienz and Ms. Darnell) that there was support for billing from the Association of Community Cancer Centers that she discovered while attending the National Oncology Conference. Ms. Gosman additionally advised that the providers in California who were having billing issues regarding this code didn't take the necessary steps needed to support their billing practices. She did not attach or provide any follow up for this statement. (Pl.'s Compl. ¶ 54).

The inference here (which must be drawn in Plaintiff's favor) is simple: the lack of follow up to this statement indicates knowledge of an improper procedure, and an attempted cover up (i.e. the lack of follow up or support for the statement).

The relevant rule on "meaningful use" is found in federal regulation. It is explained, in some detail, by CMS in 80 F.R. 62762:

> Response: In the Stage 2 final rule (77 FR 53986) and in subsequent guidance in FAQ 9058, n6 we explained for Stage 2 that a licensed health care provider or a medical staff person who is a credentialed medical assistant or is credentialed to and performs the duties equivalent to a credentialed medical assistant may enter orders. We maintain our position that medical staff must have at least a certain level of medical training in order to execute the related CDS for a CPOE order entry. …. We maintain our position that, in general, scribes are not included as medical staff that may enter orders for purposes of the CPOE objective. However, we note that this policy is not specific to a job title but to the appropriate medical training, knowledge, and experience.[5]

Office assistants are specifically prohibited under the relevant rules from entering orders. This is not, as Defendant opines, Mrs. Kietzman's opinion, it is, instead, supported by and contained in, relevant regulations. Again, Defendant misses the mark. The scienter was adequately plead and, is sufficient.

---

[5] See, also, https://questions.cms.gov/faq.php?id=5005&faqId=9058

2. Materiality is adequately plead

Defendant next argues that Plaintiff has failed to adequately plead materiality. (Brief, RE#67, at 14-15). It incorrectly argues that Plaintiff has relied on the-FERA (enacted in 2009) version of the False Claims Act. (Brief, RE#67 at 14). In support, Defendant cites *Escobar,* 136 S.Ct. 1989, 2002. Escobar made clear, however, that "[w]hen, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* at 1999. Indeed, "misrepresentations by omission can give rise to liability." *Id.* As such, "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2000.

Thus, "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 2002. Thus, the Supreme Court explained:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-2004.

It thus concluded: "Respondents have alleged that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations. Respondents may well have adequately pleaded a violation of §3729(a)(1)(A)." *Id.* at 2004.

The Second Amended Complaint contains numerous references to materiality, and the fact that the United States would not have paid the claims at issue, had it known of the illegal activities plead in the Second Amended Complaint. (Pl.'s Compl. ¶¶ 35, 49, 50, 52, 73, 77). The Second Amended Complaint also plead:

> Upon information and belief, from January 19, 2010 to the present, for each of the foregoing fraudulent billing practices, the United States actually paid the false claims in question. Had the United States known of these practices, it would not have paid submitted claims by KDHS; as such, the submissions, including false certifications of compliance by KDHS from January 19, 2010 to the present, are material. (Pl.'s Compl. ¶ 78).

> Specifically, from January 19, 2010 to the present, Defendant KDHS has submitted routine and systemic claims to the United States for payment, while falsely certifying to the United States in connection with such claims, that KDHS, and its employees and contractors were acting in compliance with governmental standards and procedures, including that claims submitted were necessary and appropriately billed. Had the United States known the truth of KDHS' claims and compliance status, as set forth in significant detail in this Second Amended Complaint, it would not have paid the claims in question. As such, the false certifications and absence of disclosure to the United States were and are material. (Pl.'s Compl. ¶ 83).

Defendant seizes on Paragraph 82, which accidentally omitted the word "material" from that sentence (Brief, RE#67, at 15), while omitting the actual factual allegations that demonstrate that materiality is satisfied, and the ***very next paragraph*** – Paragraph 83 -- that plainly pleads, and gives factual background, for materiality. Defendant simply similarly ignores the presentment claim plead at Paragraph 81 matches the statute verbatim. The point

here though is simple: the Second Amended Complaint adequately pleads sufficient facts that overcomes a Motion to Dismiss.

Defendant then shamelessly argues that the fact that it got away with its scheme, without government detection, for a long period of time, means that it should escape liability. (Brief, RE#67, at 16). It couches this absurd argument in the context of materiality – that the fact that the government kept paying the false claims means that the government must have known about the claims (even though it did not), and kept paying anyway. But all of that presumes facts that are contained nowhere in the allegations, and are, in fact belied by the allegations. If the government knew about the compliance issues and false claims, why would Dozier, the radiologists, and everyone else involved go to such efforts to keep hiding the issue? In short, the facts as set forth in the Amended Complaint overcome Defendant's arguments.

Defendant's claim that the Complaint is insufficient is utterly baseless.

3. The Fraud has been particularly plead

Relator attempts to recast its same tired, and unsupported arguments when it argues that the fraud was not plead with particularity. The who, what, when, where, and how are adequately plead, either explicitly, or through allowable inferences from the facts as plead. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (1990). Who submitted the false claims? The Defendant. (Pl.'s Compl. ¶¶24, 26, 42, 48, 49, 50, 52, 56, 58, 59, 63, 73, 77, 83). What did they submit? Claims for payment for duplicate, full diagnostic scans for RadPlanning, after an initial scan. *Id.* When? From January 1, 1999, to the present, submitting about 100 of them a year. *Id.* Where? From Defendant's facility, in Southern Indiana, and submitted to Medicare. (Pl.'s Compl. ¶¶ 3, 19-21, 24, 26, 42, 48, 49, 50, 52, 56, 58, 59, 63, 73, 77, 83). How? Again, through CMS and Medicare billing portals. *Id.*

Defendant then repeats its mantra that the current allegations are not good enough because specific claims must be submitted. (Brief, RE#67, at 19-20). In *United States ex. rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009), the Defendant argued that it was incumbent on the Relator to place in its complaint "the specific request for payment." *Id.* But the Seventh Circuit noted that "Lusby has not seen any of the invoices and representations that Rolls-Royce submitted to its customers." *Id.* "He knows about shipments and payments, but he does not have access to the paperwork." *Id.* "The district court held that, unless Lusby has at least one of Rolls-Royce's billing packages, he lacks the required particularity." *Id.*

The Seventh Circuit disagreed, noting that: "a relator is unlikely to have [billing] documents unless he works in the defendant's accounting department, [a requirement to allege specific false claims] takes a big bite out of qui tam litigation … [M]uch knowledge is inferential … and the inference that [the relator] proposes is a plausible one." 570 F.3d 849, 854. The Court concluded that "[w]e don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit." *Id.* "True, it is essential to show a false statement." *Id.* "But much knowledge is inferential--people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime--and the inference that Lusby proposes is a plausible one." *Id.*

Again, and more recently, in *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 838-839 (7th Cir. 2013), the Seventh Circuit reversed, holding the complaint was sufficient where fraudulent billing practices were alleged, by an employee with knowledge, where the inferences from the factual allegations led to the conclusion that fraudulent claims had been submitted – it was not necessary to identify specifically submitted claims.

And finally, just last year, the Seventh Circuit re-iterated this principle in *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. Wis. 2016). "Considering Ms. Presser's position as a nurse practitioner, a position that does not appear to include regular access to medical bills, we do not see how she would have been able to plead more facts pertaining to the billing process. … We hold, consistent with Lusby and Leveski, that Ms. Presser has alleged adequately that Acacia billed Medicare for services that were provided pursuant to the challenged policies and procedures." *Id.*

Indeed, it is not even necessary to plead the individual transaction details of an actually submitted false claim – rather details of the scheme is sufficient coupled with indicia that lead to a strong inference that the claims were actually submitted. *United States ex. rel. Grubbs v. Kanneganti*, 565 F.4f 180. 190 (5th Cir. 2009).

The Amended Complaint identifies an ongoing and perpetual scheme involving numerous false claims, with the required specificity. (Pl.'s Compl. ¶¶ 24-26, 43, 48-52, 56-57, 58, 61, 63, 65, 66, 73, 77). It indicates that the practice was ongoing. *Id.* It identified the practice of billing for second readings for RadPlanning. *Id.* It noted that the bills would then be submitted to the federal government for payment, after the unnecessary procedure was performed. *Id.* It noted that the reads were in contravention of CMS guidelines and regulations. *Id.* It identified approximately 100 of these improper and unnecessary radiology reads per year. *Id.* And it noted that a significant percentage were Medicare/Medicaid patients. *Id.*

The Second Amended Complaint went further, and identified that specific patients were being seen when the outside contractors were onsite from Siemens for training – from January 19, 2015 and January 23, 2015, and later from February 9, 2015 through February 13, 2015, that

patient treatment was going on, and that the fraudulent billing practices were well underway with patients being treated at that time. *Id.* at ¶ 36. This is sufficient.[6]

Defendant points to *United States v. Acacia Mental Health Clinic*, LLC, 836 F.3d 770 (7th Cir. 2016), as mandating dismissal. *Acacia* is fundamentally and critically distinguishable. In *Acacia*, the claims rested *solely* upon the Plaintiff/Relator's belief that items were being charged for that were not medically necessary. That is not so here. In *Acacia*, there was not, as there is here, affirmative allegations regarding attempts to lie about, and cover up, the improper or challenged practices. In *Acacia*, unlike here, there was not evidence and allegations that established that no other provider would even dare think about making the charges in question, and affirmative efforts by the Defendant in that case that demonstrated as much.

Finally, Relator complains about the "information and belief" allegations. (Brief, RE#67, at 26). Three points: (1) Plaintiff was not involved in the back-end coding and billing; she knows about the fraud that was perpetuated, and its details, and can, if she needs to, identify several examples of actual patients; (2) Plaintiff's "information and belief" allegations are limited to *six instances in the entire complaint*, and involve only those functions that she does not have actual knowledge of (i.e. the billing function); and (3) Plaintiff has provided significant amounts of detail about the context that give the information and belief the context necessary to provide the grounds for her suspicions and the basis for these statements.

The first "information and belief" statement was the approximate cost of the procedure at issue, as billed to the United States, which the Plaintiff identified as $375 per procedure. (Pl.'s

---

[6] If it is necessary to provide specific examples, of specific patients, for whom RadPlanning imaging was charged at a full rate, Plaintiff is able to do so, and would seek to do so with an amendment. In that event, Plaintiff would propose to identify in such an amendment the dates the services were rendered, identify patients by their initials to attempt to avoid HIPAA issues, identify how Plaintiff was able to confirm bills were submitted (she confirmed as much and saw copies of some of the bills, from the billing department and actually saw the bills, but did not remove or copy them for fear of HIPAA issues). We believe the details are sufficient as-is, but are able to provide examples and details, and simply seek guidance on how many examples the Court would like to see and in what detail.

Compl. ¶ 24). Again, Plaintiff was not involved in the billing function and thus was not aware of the exact specific dollar amount, but was aware of general costs, and was able to estimate them based on budgetary and other functions through her job duties. The second "information and belief" statement dealt with Dozier and Morgan's knowledge and directive for Combs to send the August 1, 2014 email, which makes logical sense, since Combs reported to them. Id. at ¶29. The third dealt with the allegations of the OB/GYN fraudulent billing for radiological procedures. (Pl.'s Compl. ¶ 73). Plaintiff identified the basis of her beliefs: meetings that were held where the issues were identified, but not corrected, coupled with her much more specific knowledge of ongoing fraud in relation to the radiologists in the cancer center. (Pl.'s Compl. ¶¶ 73-76; Pl,'s Compl.). The fourth dealt with awareness by Morgan and Dozier of this fraudulent billing – the basis, of course, was that Morgan sat on the committee where it was raised and reported to Dozier, and Dozier being well aware of the "sensitivity" of the radiologists to billing issues. (*Id.* at ¶¶ 74-76, 58).

And the final "information and belief" statements deal with other suspected fraud, in particular with respect to the radiologists. (Pl.'s Compl. ¶¶77-78). The basis was the fraud in the radiology reads in the cancer center, coupled with the statement that the radiologists are "sensitive" about billing. (Pl.'s Compl. ¶ 58). The grounds, having been adequately explained, and the Plaintiff, having not had access to the specific information due to her termination, has plead a limited number information and belief statements in a voluminous complaint. Defendant's arguments that these statements are, in context, inappropriate.

**D. The Conspiracy Claims are properly plead**

Defendant argues that the conspiracy claims were improperly plead because, they claim, it did not appropriately plead acts in furtherance of the alleged conspiracy. (Brief, RE#67, at 27-28).

In support, Defendant cites *United States ex rel. Morison v. Res-Care, Inc.*, 2017 U.S. Dist. LEXIS 15917 (SDIN 2017). *Morison* is distinguishable. Here, the pleadings identify the persons involved, including the specific doctors, and identifies Ms. Dozier and Ms. Morgan as at least two participants in the conspiracy on the part of KDHS and pleads facts giving rise to that inference. (Pl.'s Compl. ¶¶ 22, 27, 58-59). It identifies the amounts of the false claims. (Pl.'s Compl. ¶ 24). It identifies the acts in furtherance of the conspiracy – specifically the submission of false claims. (Pl.'s Compl. ¶¶ 24-26). And it identifies who submitted the false claims. (Pl.'s Compl. ¶24). It likewise explains the method by which the claims were submitted: through the CMS system. (Pl.'s Compl. ¶ 19-26). It identifies the ongoing fraud, from January 19, 2010 to the present. *Id.* The Second Amended Complaint is sufficient.

**E. The FCA retaliation claim is properly plead**

A FCA retaliation claim is properly plead where a Relator alleges: (1) that she acted in furtherance of a FCA enforcement action: (2) that the defendants knew she was engaged in this protected conduct; and (3) that the defendants were motivated, at least in part, to terminate her because of the protected conduct. *See Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002).

In 2009, Congress amended the qui tam retaliation statute dealing with what constitutes protected conduct. The current version of the statute (in place since 2009) states:

> (h) Relief from retaliatory actions.
>
> (1) In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others **in furtherance of an action under this section <u>or other efforts to stop 1 or more violations of this subchapter</u>** [31 USCS §§ 3721 et seq.].

31 U.S.C. 3730(h)(1) (emphasis added).

Thus, Courts have held, in light of these statutory amendments, that internal complaints are now sufficient under the revised statutory provisions – since they are in furtherance of efforts to stop 1 or more violations. *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 2016 U.S. Dist. LEXIS 121136 (EDNY 2016); *Swanson v. Battery Park City Auth.*, 2016 U.S. Dist. LEXIS 74570 (SDNY 2016). Because of these 2009 amendments, the Seventh Circuit, and district courts within the Seventh Circuit, have retreated from the 2004 case cited by Defendant – Fanslow v. Chi. Mfg. Center, Inc., 384 F.3d 468, 480 (7th Cir. 2004), *citing Brandon v. Anesthesia & Pain Mgmt. Assocs. Ltd.*, 277 F.3d 936 (7th Cir. 2002), that is at the heart of Defendant's arguments. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012); *United States ex rel. Helfer v. Associated Anesthesiologists of Springfield, Ltd.*, 2014 U.S. Dist. LEXIS 117945 (CD Ill. 2014).

The FCA's anti-retaliation provision "protects employees supplying information that could prompt an investigation or conducting their own internal investigation even where an action is never filed." *Abner v. Jewish Hosp. Health Care Servs.*, 2008 U.S. Dist. LEXIS 61985, *27 (S.D. Ind. 2008). In determining whether an employee's actions are protected under § 3730, a court will consider whether: "'(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (*quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002));[7] *United States v. Indianapolis Neurosurgical Group. Inc.*, 2013 U.S. Dist. LEXIS 23610 *, 2013 WL 652538 (S.D. Ind. Feb. 21, 2013).

---

[7] Defendant violates the pleading rules when it attempts to characterize Mrs. Kietzman as a fraud-alert employee, despite the Complaint's clear indication that she was not. (Pl.'s Compl. ¶ 8).

The citation to *Singer v. Progressive Care, SC*, 2016 U.S. Dist. LEXIS 10654 (ND Ill. 2016) is inapposite for several reasons. First, the FCA claims have been adequately plead. Second, even if there is some defect in the pleadings, as this Court noted in *Abner*, the existence of a FCA claim is not a condition precedent to maintaining a retaliation claim under 3730. *Abner v. Jewish Hosp. Health Care Servs.*, 2008 U.S. Dist. LEXIS 61985.

The Amended Complaint in this matter details Mrs. Kietzman's efforts to protect Ms. Meyer's employment from retaliation by Dozier and Morgan following a threat to report the fraudulent billing to the federal government. (Pl.'s Compl. ¶¶ 36-42). It is followed by a later, September 17, 2015 interaction between Morgan and Kietzman, where "Mrs. Kietzman expressed that people sometimes get emotional for feelings of guilt implying that Mrs. Dozier felt guilty for these practices and that Mrs. Kietzman was considering reporting the matter to the federal government. Mrs. Morgan responded, '[C]hoose your words very carefully.'" (Pl.'s Compl. ¶ 61). And that interaction was followed by a meeting with Dozier wherein Mrs. Kietzman:

> advised Ms. Dozier that she believed her email was supporting the practice of the radiologists reading CT scans, but not charging for them, since such charges would be illegal. Mrs. Kietzman noted that if the billing were occurring, she would need to report it to the federal government. Mrs. Dozier responded that it is "touchy with the radiologists when you talk about money." Mrs. Dozier stated that it seemed that her and Mrs. Kietzman were always on a "different page." Mrs. Dozier additionally told Mrs. Kietzman that she was unprofessional and unsupportive of the organization. She also expressed that she could not trust her. This statement related back to Mrs. Kietzman's opposition to the termination of Mrs. Meyer, following her threat of involving the federal government with KDHS' billing practices, and with Mrs. Kietzman's opposition to ongoing fraud and her threat of reporting the issue to the federal government. Mrs. Kietzman replied that it was hurtful to hear that, and that she felt as though Mrs. Dozier did not know her because people who did know her would not feel that way. … (Pl.'s Compl. ¶ 63).

On October 5, 2015, Kietzman was terminated "due to her opposition to ongoing fraudulent billing of the United States Government, in and within, the Cancer Center and her statements that she would report such activity to the federal government and pursue legal action." (Pl.'s Compl.

¶70). And, "[f]ollowing her termination, Mrs. Kietzman caused a letter to be placed in her file, as of record, that indicated her disagreement with the letter, and indicated that her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by KDHS, and retaliation by Mrs. Dozier and Mrs. Morgan for Mrs. Kietzman not turning her head the other way." (Pl.'s Compl. ¶ 72). Furthermore, Mrs. Kietzman undertook action in furtherance of an enforcement action by repeatedly voicing her concerns regarding fraudulent billing for Medicare and by indicating that she was contemplating the action of reporting the matter to the federal government. (Pl.'s Compl. ¶ 95). Defendant had knowledge that Mrs. Kietzman was engaged in protected conduct by virtue of their knowledge of Mrs. Kietzman's accusations. (Pl.'s Compl. ¶ 96). Mrs. Kietzman was discharged, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment because of her lawful acts in furtherance of an action under 31 U.S.C. § 3730 as well as other efforts to stop one or more violations of this 31 U.S.C. § 3729 and 3730. (Pl.'s Compl. ¶ 97). Mrs. Kietzman's discharge was motivated by her involvement in protected conduct. (Pl.'s Compl. ¶ 98).

Defendant's claims that Mrs. Kietzman's actions were not taken in furtherance of a FCA enforcement action could not be further than the truth.

The opposition to illegal billing practices, statements regarding Dozier's "guilt" that were made to Morgan mere weeks before the termination, opposition to retaliation to Mrs. Meyer, and ultimately the statement regarding ensuring that there was not any ongoing fraudulent billing for the second scan weeks before the termination, all give rise to an inference that the termination was in response to engaging in protected activity.

Defendant's claims to the contrary run afoul of the liberal pleading standard and plausibility standards of Civ. R. 12(B)(6). The retaliation claim has been adequately plead.

### F. Because the federal claims survive, supplemental jurisdiction is appropriate

Plaintiff has adequately plead federal claims, and thus the supplemental jurisdiction over the state law claims is also appropriate. 28 U.S.C. 1367(c).

## IV. CONCLUSION

Defendant's Motion to Dismiss should be denied in its entirety. To the extent that this Court is inclined to grant any of it, however, the Court should permit Plaintiff the opportunity to correct any deficiencies in an amended pleading, which she is able to do, and will do, depending on the outcome of this current motion practice.

Respectfully submitted,

s/Thomas B. Bruns

Thomas B. Bruns (0051212)
BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
Phone: 513-312-9890
Fax: 513-800-1263
tbruns@bcvalaw.com
*Counsel for Plaintiff/Relator Jessica Kietzman*
*Admitted Pro Hac Vice*

Andrew Dutkanych, #23551-49
Krista A. Willike, #32550-10
BIESECKER DUTKANYCH & MACER, LLC
101 N. 7th Street
Louisville, KY 40202
Telephone: (502) 561-3443
Facsimile: (502) 561-3444
E-mails: ad@bdlegal.com
kwillike@bdlegal.com
*Counsel for Plaintiff/Relator Jessica Kietzman*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2017 a copy of the foregoing was filed via the Court's CM/ECF system, which will provide notice to all counsel.

Rodney L. Scott
Waters, Tyler, Hofman Scott, LLC
1947 East Spring St.
New Albany, IN 47150
rscott@wthslaw.com

Michael W. Hawkins
Jennifer Orr Mitchell
Matthew S. Arend
Dismore & Shohl LLP
255 E. Fifth St., Suite 1900
Cincinnati, OH 45202
michael.hawkins@dinsmore.com
jennifer.mitchell@dinsmore.com
matthew.arend@dinsmore.com

Shelese M. Woods
U.S. Attorneys' Office
10 West Market St., Suite 2100
Indianapolis, IN 46204
Shelese.woods@usdoj.gov
Counsel for the United States of America

s/Thomas B. Bruns
Thomas B. Bruns (0051212)

Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
513-312-9890
513-800-1263 Fax