UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. Jessica Kietzman, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:16-cv-00009-SEB-DML |
| BETHANY CIRCLE OF KING'S DAUGHTERS OF MADISON, INDIANA, INC.   d/b/a KING'S DAUGHTERS' HOSPITAL AND HEALTH SERVICES, | ) ) ) ) ) ) | |
| Defendant. | ) ) | |
| JESSICA KIETZMAN, | ) ) | |
| Relator. | ) ) ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS (DKTS. 66, 68)**

Relator Jessica Kietzman ("Kietzman"), on behalf of the United States, brought this *qui tam* action against her former employer, The Bethany Circle of King's Daughters' of Madison, Indiana, Inc. ("Bethany Circle"), under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, alleging chiefly that Bethany Circle fraudulently overbilled the United States for certain medical services. There are also state and federal claims for wrongful and retaliatory discharge, which Kietzman brought personally on her own behalf. Now before the Court is Bethany Circle's motion to dismiss Kietzman's second amended complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). For the reasons below, the motion is granted in part and denied in part. Because the briefs

1

adequately present the issues for decision, we also summarily deny Bethany Circle's motion for oral argument on the motion to dismiss.

## Facts and Procedural History

The complaint is hardly a model of clarity, but we take its allegations, so far as their meaning and relevance are comprehensible without speculation, as true for the purposes of the instant motion.

Bethany Circle operates a hospital ("the Hospital") in southern Indiana. The Hospital has a cancer center ("the Cancer Center"). Kietzman, a registered nurse, was hired by the Hospital in 1999, and promoted to director of the Cancer Center in 2007. For at least 2014 and 2015, Kietzman reported to Lisa Morgan ("Morgan"), the Hospital's vice president for "Patient Services." Second Am. Compl. (SAC) ¶ 9. Kietzman was fired from the Hospital in October 2015, despite having consistently received "exemplary" performance reviews and no employee discipline. *Id.* ¶ 8.

Some proportion of patients of the Hospital and Cancer Center were beneficiaries of Medicare, a federal program administered by the Centers for Medicare and Medicaid Services (CMS).

> When a Medicare claim is submitted, it processes through a series of edits [*sic*] in the Fiscal Intermediary Standard System [an undefined term] to ensure that the information provided is complete and correct. If the claim is deemed incomplete or incorrect, it is sent to a return to provider ("RTP") file. In connection with each claim submitted to Medicare . . . for payment, a provider, such as [the Hospital], is required to, and does, make certain certifications, including certifications that the procedure in question was in compliance with CMS rules, regulations, and guidelines.

> Absent such certifications, the payments are not processed
> and made.

*Id.* ¶ 20. The Hospital's billing procedures relating to CMS are at the heart of Kietzman's case.

## I. The Unnecessary Radiological Scans (SAC ¶¶ 22–43)

Since January 2010 (not a date relevant *per se*, but the earliest date within the FCA's six-year limitations period), the Cancer Center's independent-contractor radiologists would perform an "initial diagnostic scan ('IDS')" (the nature of the "scan" is not specified) on new oncology patients. *Id.* ¶ 22. Then, "typically" within two weeks of the initial scan, the radiologists would perform a "second full diagnostic [scan] for radiation treatment planning ('RadPlanning')[.]" *Id.* ¶ 23. The second scan is alleged to be "improper and unnecessary." *Id.* The Hospital's practice was to bill CMS for both scans, "which was in contravention of CMS guidelines and regulations[,]" *id.* ¶ 24, but Kietzman does not tell us which guidelines and regulations were contravened, or in what respects. Kietzman avers it "[u]pon information and belief" that the Hospital performed approximately one hundred of these second, unnecessary scans per year, a "significant percentage" of which was for Medicare patients. *Id.*

Margie Combs ("Combs") served as the Hospital's director of "Risk Management, Patient Safety[,] and Compliance[.]" *Id.* ¶ 15. She reported to Carol Dozier ("Dozier"), the Hospital's CEO, or to the Hospital's CFO. Around the beginning of August 2014, Combs "sent emails out to all the Indiana hospitals that participated in the same risk retention group as [the Hospital], inquiring . . . whether they billed CMS for the second

scan." *Id.* ¶ 28. "Every hospital" contacted responded that it did not, and several responded that such billing "was illegal, improper, and against CMS rules and regulations." *Id.* Combs's e-mails and the hospitals' responses was the first Kietzman heard of the Hospital's practice of billing for the second scans. "Upon information and belief," Kietzman alleges that Combs was directed to send the e-mails by Dozier and Morgan, knowing that billing CMS for the second scans was illegal and "desiring to provide 'cover'" for the Hospital. *Id.* ¶ 29. On January 29, 2015, Dozier informed Cancer Center staff, including Kietzman, that the Hospital would continue to bill for the second scans.

In February 2015, trainers from Siemens USA, from whom the Hospital had purchased scanning equipment, were at the Hospital to train Hospital staff on the use of the new equipment. The trainers "questioned" the Hospital's practice of performing the second scans. *Id.* ¶ 36. Present at the time was Elizabeth Meyer ("Meyer"), an independent-contractor physicist at the Cancer Center who reported to Kietzman, who threatened to "turn [the Hospital] into the United States Government, for fraudulent billing, if this practice did not immediately stop." *Id.* Kietzman was informed of this exchange by a later e-mail from another Hospital staffer, which characterized Meyer's comments as "inappropriate." *Id.* ¶ 38.

Kietzman was also informed that Dozier intended to terminate Meyer's employment based on her comments. Kietzman thought such action would be ill advised, resulting in a February 15, 2015, meeting with Meyer, Morgan, and Dozier, during which Dozier told Meyer "that her comments were inappropriate, and that [Dozier] would not

tolerate anyone who threatened to report any of [the Hospital's] practices to the federal government, nor would she permit anyone who did so to remain employed" at the Hospital. *Id.* ¶ 41. Meyer then apologized, and Dozier explained that the Hospital's second-scan practice "was for 'best patient care'" and that the Hospital "did not bill" for the second scans. *Id.* ¶ 42. Kietzman alleges that Dozier was lying when she made this statement, but that Kietzman was unaware that it was a lie at the time—despite Kietzman's allegation that, two weeks earlier, Dozier had informed Cancer Center staff that the Hospital would *continue* to bill for the second scans. Perhaps Kietzman meant to allege that, at the February 15, 2015, meeting, Dozier represented that the Hospital would *cease* billing for the second scans. These averments are unclear.

On February 18, 2015, Kietzman was informed by a radiation therapist who reported to her that "additional charges should not be entered according to the code book[,] . . . a reference manual . . . outlin[ing] when charges [to CMS] are, and are not, appropriate." *Id.* ¶ 43. This statement "was intended to alert [Kietzman] to the fact that the directive from [Dozier] was illegal." *Id.* Kietzman does not explain what Dozier's "directive" was, what "additional charges" were being discussed, and why their not being entered "according to the code book" was intended to "alert" Kietzman to the "illegality" of Dozier's "directive."

## II. The Fiducial-Marker Kickbacks (SAC ¶¶ 47–49)

Around the middle of April 2015, Kietzman approached Combs and another Hospital manager about the Hospital's billing for "fiducial markers," that is, "interstitial devices for radiation therapy," implanted by independent-contractor urologists at the

Hospital. *Id.* ¶ 47. The urologists "desired" that the Hospital "begin" purchasing fiducial markers for their use, presumably rather than require the urologists to purchase the markers for themselves. *Id.* As (again presumably) some proportion of the purchased fiducial markers would be implanted in Medicare beneficiaries, Kietzman appears to have believed that the Hospital's purchasing the markers and billing Medicaid for them, when they should have been paid for by the urologists themselves, constituted a kickback and an "illegal[] entic[ement to] the urologists to send patients to [the Hospital] . . . ." *Id.* But Combs told Kietzman that, because "the urology department [was] receiving credit for the billing for the fiducial markers, there were no compliance concerns." *Id.*

### III.  The Meaningful-Use Violations (SAC ¶¶ 50, 53)

"According to CMS," entering a radiology order into "the electronic medical system" must be done "by a licensed healthcare professional or a credentialed medical assistant." *Id.* ¶ 50. "This requirement falls under the 'meaningful use' mandate set by CMS." *Id.* Between June and August 2015, Kietzman informed Morgan that nonqualified Hospital personnel were entering orders into the system. Morgan responded "that they needed to help the physicians 'get where they needed to be.'" *Id.* Kietzman told Morgan "that it would be inappropriate and illegal to do so." *Id.*

### IV.  The Supervising-Provider Violations (SAC ¶¶ 51–52)

In the summer of 2015, Kietzman was told by Morgan and Dozier to "find a physician within [the Hospital] to be the 'supervising provider' for medical oncology, if a medical oncologist was absent, pursuant to CMS regulations." *Id.* ¶ 51. Obligingly, Kietzman "arranged for a surgeon to obtain certain training and education on oncology

issues sufficient to meet CMS guidelines for a supervising provider." *Id.* She then took a two-week medical leave.

In her absence, Morgan and Dozier "knowingly and illegally assigned physicians who did not meet 'supervising provider' criteria to perform those roles. Specifically, the physicians in question did not have privileges to order the procedures in question." *Id.* ¶ 52. When Kietzman returned from leave, she "raised serious concerns" about this matter with Dozier and Morgan. *Id.*

## V.  The Direct-Supervision Violations (SAC ¶ 56)

"According to CMS, radiation therapy requires direct supervision. Direct supervision requires a physician to provide supervision by being immediately available and interruptible to provide assistance and direction throughout the performance of the procedure." *Id.* ¶ 56. On September 9, 2015, Kietzman informed Morgan that, because Cancer Center physicians were requesting too many days off, they were unable to directly supervise all Cancer Center radiation therapy. Morgan responded "that they would 'have to make it work,' because a physician was unable to come in." *Id.*

## VI.  The Full Ultrasounds (SAC ¶¶ 73–76)

Kietzman is informed and believes that, since 2010, the Hospital has "invoiced CMS and the United States for full radiological reads," while performing only "limited or follow up ultrasounds that should have been billed and reimbursed under different [billing] codes." *Id.* ¶ 73. This issue was raised at "one . . . meeting[]" by "one of the . . . physicians" "[a]t some time between 2007 and 2009[.]" *Id.* ¶ 15.

## VII.  Retaliation (SAC ¶¶ 58, 60–64, 67–72)

On September 15, 2015, a Cancer Center staffer sent an e-mail to Cancer Center employees, including Kietzman, inquiring about the Hospital's billing practices with respect to radiological scans. Kietzman responded to the e-mail "stating that it was her impression that the radiologists were reading treatment planning CT scans, but not charging for them." *Id.* ¶ 58. Dozier, an addressee of the original e-mail, replied to Kietzman, "Why would you copy all these people on this question? This is unprofessional." *Id.* Less than two hours later, Dozier sent a second e-mail to Kietzman, apologizing for the tone of her first e-mail and asserting that "the radiologists are very sensitive on this and when we mention charging, they get defensive." *Id.*

The next day, September 16, 2015, Morgan asked to meet with Kietzman to discuss the previous day's e-mail exchange with Dozier, and that meeting occurred the following day, September 17, 2015. It was Morgan's opinion that Kietzman "should have been at [Dozier's] door first thing [the day before] apologizing for her actions." *Id.* ¶ 61. Kietzman responded that she had simply stated Hospital policy as she understood it. Morgan nevertheless thought Kietzman had been "disrespectful" and "needed to make the situation 'right'" with Dozier. *Id.* Kietzman still did not understand what she had done to give offense and "stated that she found it interesting" that Dozier had subsequently apologized for her first e-mail. *Id.* Kietzman noted that "people sometimes get emotional for feelings of guilt, implying that [Dozier] felt guilty for these practices, and that [Kietzman] was considering reporting the matter to the federal government. [Morgan] responded, 'Choose your words very carefully.'" *Id.*

Later the same day, September 17, 2015, Dozier met with Kietzman and Morgan. Dozier again apologized for the tone of her first e-mail on September 15, 2017, and asked Kietzman "to clarify any questions she may have before she sends out emails." *Id.* ¶ 63. As she had with Morgan, Kietzman expressed confusion over what her misstep had been and "noted that if the billing [for the second radiological scans] were occurring, she would need to report it to the federal government." *Id.* Dozier repeated that "it is 'touchy with the radiologists when you talk about money.'" *Id.* Dozier "stated that it seemed that her and [Kietzman] were always on a 'different page.' [Dozier] additionally told [Kietzman] that she was unprofessional and unsupportive of the organization. She also expressed that she could not trust her." *Id.*

On October 5, 2015, Morgan met with Kietzman "and informed her that her employment was terminated[,]" *id.* ¶ 69, producing a termination letter dated October 2, 2015.

> The letter alleged that [Kietzman] was not happy in her position and that her staff were not pleased with her. The letter additionally alleged that [Kietzman] applauded employees who were considering a job change and that there were ongoing issues within the department, but [Kietzman] refused to make the necessary changes to address these issues. The letter cited miscommunications and lack of leadership on Kietzman's behalf. Specifically, the letter stated, '[Y]ou have had two separate instances with the CEO that were less than exemplary.' Lastly, the letter cited concerns from directors, deficiencies in open positions and issues surrounding failing to utilize appropriate channels for pre-employment screening.

*Id.* ¶ 69 (fourth alteration in original). In response to her firing, Kietzman "caused a letter to be placed in her file, as of record, that indicated her disagreement with the

[termination] letter, and indicated that her termination was solely due to her ongoing opposition to the fraudulent billing of Medicare by [the Hospital], and retaliation by [Dozier] and [Morgan] for . . . not turning her head the other way." *Id.* ¶ 72.

## VIII.  The Instant Motions

Kietzman's original complaint was filed on January 19, 2016. Dkt. 1. After the United States declined to intervene, Dkt. 17, Kietzman filed a first amended complaint as of right on November 22, 2016. Dkt. 19. In the face of Bethany Circle's first motion to dismiss, Dkt. 46, Kietzman sought leave to file a second amended complaint, Dkt. 50, which, leave having been granted, Dkt. 64, was filed on March 24, 2017. Dkt. 65. It is now the operative complaint in this matter. Bethany Circle filed the instant motion to dismiss on April 10, 2017, Dkt. 66, seeking oral argument. Dkt. 68. The motion to dismiss is now fully briefed and ripe for decision.

Counts I and II of the complaint are *qui tam* claims brought by Kietzman on behalf of the United States. Count I charges presentment of false or fraudulent claims in violation of the FCA; Count II charges conspiracy to commit the same. Counts III and IV are claims filed by Kietzman personally, respectively charging wrongful and retaliatory discharge under state law and under the FCA. Bethany Circle attacks the three federal claims as insufficiently pleaded and urges us to relinquish jurisdiction over the state claim.

## Standard of Decision

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy the requirements

of Rule 8(a) and withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face . . . ." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when supported by sufficient factual allegations which, taken as true, give rise to a reasonable inference of liability. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Legal conclusions, formulaic recitation of elements of the cause of action, and speculative possibilities will not do. *Id.* In all, the pleader must simply "give enough details about the subject-matter of the case to present a story that holds together." *Swanson*, 614 F.3d at 404.

But the complaint's Counts I and II are subject to a heightened pleading standard. Because such claims under the False Claims Act sound in fraud, the circumstances alleged to constitute the fraud must be pleaded with "particularity." Fed. R. Civ. P. 9(b); *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016) (citing *United States ex rel. Gross v. AIDS Research All.-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005)).[1] Under Rule 9(b), a relator must allege "the first paragraph of any newspaper story": "the who, what, when, where, and how" of the alleged fraud. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). While it is "erroneous[]" to "take an overly rigid view of th[is] formulation," *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011),

---

[1] The wrongful and retaliatory discharge claims contained in Counts III and IV do not sound in fraud and are not subject to Rule 9(b).

*quoted in Acacia*, 836 F.3d at 776, the application of which "may vary on the facts of a given case[,]" *id.*, Rule 9(b) must require "some . . . means of injecting precision and some measure of substantiation . . . [,]" *id.* (quoting 2 James W. Moore, *Moore's Federal Practice* § 9.03 (3d ed. 2010)), if it is to serve its important functions of "forc[ing] the plaintiff to conduct a careful pretrial investigation" and "protect[ing] defendants from [the] 'privileged libel'" of fraud charges. *Id.* at 441 (quoting *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005); *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003)). "It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Lusby*, 570 F.3d at 854–55.

## Analysis

Although the strictures of Rule 9 are supposed to force the plaintiff to investigate first and sue later, it is clear based on her complaint that Kietzman has not heeded that admonition. *See also* Fed. R. Civ. P. 11(b) (requiring inquiry "reasonable under the circumstances"). Kietzman's allegations (when not wholly conclusory) appear to be the product, not of careful pretrial investigation, but of her partial, limited perspective as a single employee, based entirely on her own imperfectly understood, decontextualized impressions and recollections, leaving key terms, concepts, and events unexplained. We take up each of her claims below, beginning with the three federal claims.

## I.  Submission of False Claims to Medicare, FCA (Count I)

The FCA provides that a person is liable to the United States if she "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval[,]" 31 U.S.C. § 3729(a)(1)(A), or if she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" *Id.* § 3729(a)(1)(B). Such claims may be brought on behalf of the United States by a relator functioning as a "private attorney[] general . . . ." *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006).

To state a claim under Subsection (A), a relator must show: "(1) a false claim (2) which the defendant presented or caused to be presented to the United States for payment (3) knowing that the claim was false." *United States ex rel. Morison v. Res-Care, Inc.*, No. 4:15-cv-94, 2017 WL 468287, at *2 (S.D. Ind. Feb. 3, 2017) (citing *Fowler v. Caremark RX, L.L.C.*, 496 F.3d 370, 740–41 (7th Cir. 2007), *overruled in nonrelevant part by Glaser v. Wound Care Consultants*, 570 F.3d 907 (7th Cir. 2009)). To state a claim under Subsection (B), a relator must show that "(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false[,]" *id.* (citing *Fowler*, 496 F.3d at 741), as well as (4) materiality. 31 U.S.C. § 3729(a)(1)(B); *see id.* § 3729(b)(4) (defining materiality).

With respect to liability for noncompliance with federal regulations (or rules or statutes or contractual obligations), three general principles guide our analysis. First, to be simultaneously in receipt of government money and in violation of federal regulations is not fraud under the FCA. *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014). Second, an express certification of compliance made with present knowledge of its falsity or with the present intent not to honor it is fraud under the FCA if the certification is material to the government. 31 U.S.C. §

3729(a)(1)(B); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). Third, an implied certification of compliance is fraud under the FCA where, "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Univ'l Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

Kietzman's complaint alleges six sets of false claims, or, more accurately, six ways in which federal regulations were flouted at the Hospital. The first is that Hospital radiologists would perform, and bill the government for, two full diagnostic scans on oncology patients, though the second scan was "improper and unnecessary." SAC ¶ 23. The second is that the Hospital paid for, and presumably billed the government for, "fiducial markers" implanted by contractor urologists, a kind of kickback to the urologists. *Id.* ¶ 49. The third is that the Hospital directed employees other than "physicians and credentialed medical assistants" to enter orders into the "electronic medical system" in violation of the government's "meaningful use" mandate. *Id.* ¶ 50. The fourth is that the Hospital directed physicians who did not meet the criteria to be a "supervising provider" in the oncology department to fill that role nevertheless. *Id.* ¶ 52. The fifth is that radiation therapy was performed without direct supervision by a physician, contrary to federal rules. *Id.* ¶ 56. The sixth is that "full anatomical ultrasound[s]" would be performed by Hospital radiologists when the ordering physician

had only requested "limited or partial ultrasounds[.]" *Id.* ¶ 75.[2] We discuss these theories below in light of the general principles above.

### A. Falsity

"[I]t is essential to show a false statement" or claim. *Lusby*, 570 F.3d at 854. Kietzman has not. Kietzman has not pleaded with particularity a single actionable express or implied certification made by the Hospital. The "general statement" about certifying compliance with the whole body of applicable federal regulations contained in paragraph 20 of the second amended complaint "is not sufficient to satisfy Rule 8, let alone Rule 9(b)." *United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-cv-1392, 2014 WL 378644, at *7 (C.D. Ill. Feb. 3, 2014).

For example, with respect to the unnecessary radiological scans, the complaint alleges simply that they were "improper and unnecessary." SAC ¶ 23. The complaint never alleges that, by regulation or contract, the Hospital specifically and expressly certified to Medicare that it would provide only proper and necessary radiological scans.[3]

---

[2] There are also scattered allegations relating to inadequate documentation by "the medical oncologist," SAC ¶¶ 44–45, 55, but these are nonstarters. There is finally a catch-all residuary allegation that, "upon information and belief, there are additional unknown, but ongoing, fraudulent billing" practices at the Hospital, *Id.* ¶ 77, but that allegation cannot satisfy even Rule 8(a), not to speak of Rule 9(b). We disregard these allegations without further discussion.

[3] The complaint never even alleges an objective standard by which the scans' propriety and necessity was measured. *See United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779 (7th Cir. 2016) ("[Relator] provides no medical, technical, or scientific context which would enable a reader of the complaint to understand why [defendant's] alleged actions amount to unnecessary care forbidden by . . . statute. . . . [T]he complaint does not provide any reasons *why* these treatments actually were unnecessary other than [Relator's] personal view."). The complaint does allege that other hospitals in the Hospital's "risk retention group," SAC ¶ 28, as well as medical-equipment trainers from Siemens, *id.* ¶ 36, excepted to the Hospital's billing practices, but not to the medical necessity or propriety of a second scan *per se*. Moreover, the complaint simultaneously alleges (or appears to allege) that the Hospital's billing

Nor does the complaint allege that the Hospital impliedly made specific representations about the radiological scans which were misleading half-truths due to the Hospital's omission of the fact that Kietzman deemed them unnecessary or improper. In short, there is no allegation at all that the Hospital *concealed* what it was doing (for example, by use of false or misleading billing codes) from the government. Apparently, the Hospital would simply send Medicare two bills for two radiological scans for the same patient within two weeks, and the government would pay them. Kietzman may quibble with the government's payment decisions as being an unwise use of taxpayer funds, but she has nowhere alleged the fraudulent procurement of such funds.

These same flaws are not cured with respect to any other of Kietzman's allegations of impropriety. She alleges repeatedly that federal regulations were violated at the Hospital, and that the government would not have paid out claims for treatment where such violations had occurred at some stage of the treatment process, but nowhere alleges how, or even whether, the Hospital concealed or falsely represented what it was doing to the government. Accordingly, Kietzman's complaint fails to state a claim for actionable fraud under the FCA.

### B. Materiality

---

practices were in fact approved by the "Association of Community Cancer Centers." *Id.* ¶ 54. Taken together, these allegations suggest a difference of opinion about billing, and no opinion at all about treatment other than Kietzman's.

Materiality is a "familiar and rigorous" standard to be enforced as necessary on a motion to dismiss. *Escobar*, 136 S. Ct. at 2004 n.6. Kietzman's complaint fails to satisfy it.

Under the FCA, materiality means "having a natural tendency to influence, or be capable of influencing, the payment" by the government. 31 U.S.C. § 3729(b)(4). "Under any understanding of the concept,[4] materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (alteration, quotations, and citation omitted). Not every breach of contract or regulation is material, and "minor or insubstantial" noncompliance never is. *Id.* at 2003. The government's designation of particular compliance as a condition of payment does not in itself satisfy materiality, nor does a showing that the government "would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

> [T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include . . . evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

---

[4] *Escobar* interpreted Subsection (A), which, unlike Subsection (B), does not by its terms require materiality. But the Supreme Court approved implied false certification as a theory of FCA liability only after first holding that FCA "fraud" incorporates common-law elements, including materiality. *Univ'l Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016). The Court found it unnecessary to decide "whether [Subsection (A)'s] materiality requirement is governed by [Section 3729(b)(4), the statutory definition of materiality for the purposes of Subsection (B), itself derived from Supreme Court case law interpreting "common-law antecedents[,]"] or derived directly from the common law." *Id.* at 2002.

> Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04.

Though Kietzman's complaint would impose liability on Bethany Circle entirely or nearly so for noncompliance with federal regulations, and she therefore must show the materiality of the Hospital's implied or express certifications under either Subsection (A) or Subsection (B), the complaint does not contain a single nonconclusory allegation of materiality. Kietzman either alleges baldly that a certain alleged act of noncompliance was "material," or, restating the concept, that the government "would not have paid" had it known of the Hospital's alleged noncompliance. *See, e.g.,* SAC ¶¶ 25, 35, 49, 50, 52, 73, 77, 78, 83. No facts are alleged as to what types of claims the government usually did or did not pay, nor as to what the government's compliance priorities were, nor as to the degree of severity of the Hospital's alleged breaches of regulation. For example, does Medicare usually refuse to pay claims for treatment where any order issued in the course of the treatment was entered into "the electronic medical system" neither "by a licensed healthcare professional [n]or a credentialed medical assistant"? *Id.* ¶ 50. We have no way of knowing because the complaint is utterly silent on the issue.

"The materiality standard is demanding." *Escobar*, 136 S. Ct. at 2003. Kietzman's bald conclusions here have not met its demands, and accordingly fails to state a claim for actionable fraud under the FCA.

*C.  First-Paragraph Particularity Problems*

Quite apart from the failures of Kietzman's complaint to show falsity and materiality, the complaint's allegations do not state the circumstances of any fraud with particularity. To begin with, Kietzman has not identified with particularity a single false claim or statement actually submitted or made to the government to extract payment from it. *Grenadyor*, 772 F.3d at 1107 (7th Cir. 2014) ("To comply with Rule 9(b) [relator] would have had to allege either that the pharmacy submitted a claim to Medicare . . . on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback . . . ."); *Fowler*, 496 F.3d at 741–42 ("Relators do not present any evidence *at an individualized transaction level* to demonstrate" fraudulent retention of federal refunds); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Some [allegations] come close[] to specific allegations of deceit but fail to link them to any claim for payment."); *United States ex rel. Soulias v. Nw. Univ.*, No. 10 C 7233, 2013 WL 3275839, at *3 (N.D. Ill. June 27, 2013) ("To satisfy Rule 9(b) for an FCA claim, a relator must plead at least some actual examples of false claims.") (citing five cases in addition to those already cited here). While "'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they must still 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud[.]" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (quoting 2 James W. Moore, *Moore's Federal Practice* § 9.03 (3d ed. 2010)). Kietzman's complaint employs no such means or measures.

Indeed, Kietzman does not even allege on personal knowledge that any Medicare beneficiary was ever treated at the Cancer Center. "Upon information and belief," Kietzman alleges that "a significant percentage" of the Cancer Center's radiology patients were "Medicare/Medicaid patients[,]" SAC ¶ 24, but fraud cannot be alleged on information and belief unless the relevant facts are not accessible to the pleader and she provides the grounds for her suspicions. *Pirelli*, 631 F.3d at 443.[5] As the former director of the Cancer Center, Kietzman would not be overtaxed to allege on personal knowledge an approximate figure for Medicare patients at the Cancer Center, and in any event cannot plausibly claim to have lacked access to such a figure. Nor does any ground for her supposition as pleaded appear in the complaint. Even if, counterfactually, Kietzman's allegations were sufficient to allege that one of the "approximately 100 . . . improper and unnecessary" radiological scans was probably administered to a Medicare beneficiary, SAC ¶ 24, that cannot suffice with respect to, for example, the direct-supervision violations, which the complaint does not even allege actually occurred. The complaint alleges only that Morgan told Kietzman the Hospital "would 'have to make it work,' because *a* physician was unable to come in." *Id.* ¶ 56 (emphasis added). The complaint does not allege that any radiation therapy was actually administered to any patient, much

---

[5] The same rule defeats the allegations in paragraphs 29 (regarding Morgan and Dozier prompting Combs to send e-mails to other hospitals), 73 and 76 (relating to billing for full ultrasounds), 77 (relating to "additional unknown" fraud), and 78 ("[F]or each of the foregoing fraudulent billing practices, the United States actually paid the false claims in question.") of the second amended complaint.

less a Medicare patient, on the single day, apparently September 9, 2015, that "a physician was unable to come in." *Id.*

Kietzman points us to *Lusby*, where relator, an engineer, was allowed to proceed in his *qui tam* suit without "produc[ing] the invoices" for the fraudulent payments he alleged, which he could not be expected to have had "unless he work[ed] in the defendant's accounting department," which he did not. 570 F.3d at 854. But, there, relator was able to specify "five contracts between Rolls-Royce and the United States" and the "particular specifications" provided for by them; test results showing that Rolls-Royce's products did not meet those specifications; "specific parts shipped on specific dates, and . . . details of payment"; and, finally, the specific certification of contractual compliance Rolls-Royce would have made to the government in order to receive such payment. *Id.* at 853–54. The only inference required was that the certifications were actually made, but that was an entirely reasonable inference given the predicates specifically alleged. Here, by contrast, no predicate facts are alleged from which to draw any inference; there is merely an allegation on information and belief that the federal government footed the bill for a "significant percentage" of the Cancer Center's patients. SAC ¶ 24. That is not enough.[6]

---

[6] In her briefing, Kietzman avers that she is in possession of (but, of course, has not *pleaded*) "specific examples, of specific patients" whose services were fraudulently billed to Medicare, and "simply seek[s] guidance on how many examples the Court would like to see and in what detail." Pl.'s Br. Opp. 29 n.6. This is a bewildering request. This Court does not sit to dispense complaint drafting advice to learned counsel. The pages of the *Federal Reporter* and *Federal Supplement* overflow with allegations of fraud in the provision of health-care services that have been found to satisfy Rule 9(b) while simultaneously "avoid[ing] HIPAA issues[.]" *Id.*

Moreover, while the complaint faults the Hospital for failing to comply with applicable federal regulations, it has not identified with particularity a single federal regulation allegedly violated. That is a problem.

> Where the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions, the plaintiff should be able to tell the [defendant] which ones it flouted, and how and when. If the particularity requirement is meant to ensure more thorough investigation before filing, it is not too much to ask that one aspect of that investigation include the specific provisions of law whose violation made the certification of compliance false.

*United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016).

Here is Kietzman's best attempt to satisfy *DiLeo*'s first-paragraph standard with respect to the allegedly unnecessary radiological scans: "Who submitted the false claims? The Defendant." Pl.'s Br. Opp. 26. That is a risible response. The Bethany Circle of King's Daughters' of Madison, Indiana, Inc. did not submit anything within the meaning of Rule 9(b); one of the Hospital's employees did. But *which* of them? Kietzman cannot tell us. "What did they submit? Claims for payment for duplicate, full diagnostic scans for RadPlanning, after an initial scan." *Id.* Missing is any particularized showing such claims were actually presented, or that they were *false*. "When? From January 1, 1999, to the present, submitting about 100 of them a year." *Id.* That is worse than risible; it is flatly misleading. No allegation in the complaint reaches back to 1999 except as to Kietzman's hiring date. No allegation in the complaint reaches forward to May 3, 2017 (the day Kietzman filed her response, Dkt. 79), because Kietzman was fired from the Hospital in October 2015. And there is nothing particularized in alleging, without more,

that an event happened "about" one hundred times per year over an eighteen-year period. "Where? From Defendant's facility, in Southern Indiana, and submitted to Medicare. How? Again, through CMS and Medicare billing portals." *Id.* But that is no more than a general allegation that the Hospital sometimes billed Medicare.

In sum, Kietzman's complaint falls far short of alleging actionable fraud under the FCA with particularity.

## II.  Conspiracy to Defraud, FCA (Count II)

The FCA provides that a person is liable to the United States if she conspires to violate the FCA, as relevant here, by presenting a false claim or making a false statement material to a false claim. 31 U.S.C. § 3729(a)(1)(C). "[G]eneral civil conspiracy principles apply to FCA conspiracy claims." *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 666 (N.D. Ill. 2015) (citing *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999)). Accordingly, "[t]o plead a conspiracy claim, the relator must allege an agreement by two or more persons to accomplish a goal or goals and an act in furtherance of that agreement." *United States ex rel. Morison v. Res-Care, Inc.*, 4:15-cv-94, 2017 WL 468287, at *4 (S.D. Ind. Feb. 3, 2017) (citing *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938–39 (7th Cir. 2012)). The act in furtherance of the agreement must be overt and result in actual damage or injury. *United States ex rel. Rockey v. Ear Inst. of Chi., LLC*, 92 F. Supp. 3d 804, 825 (N.D. Ill. 2015) (distinguishing civil and criminal conspiracy) (quoting *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir. 1983)). "Put differently, an actionable FCA conspiracy exists only where at least one of the alleged co-conspirators actually committed an FCA violation."

*Id.* at 826. Moreover, agents of the same corporate principal cannot actionably conspire with one another. *Id.* (citing *inter alia Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984) (Sherman Act conspiracy)).

Kietzman has not sufficiently alleged either an agreement or an injury resulting from it. First, for the reasons stated above, Kietzman's complaint fails to allege an FCA violation, and therefore fails to show actual injury resulting from any conspiracy to defraud the government. Her conspiracy claim therefore fails.

Second, because Kietzman cannot allege conspiracy by claiming, for example, that Morgan and Dozier (both as agents of the Hospital) agreed with one another to defraud the government, she must rely on a conspiracy between Hospital staff and the independent-contractor radiologists and urologists. *See* SAC ¶¶ 87–88. But the complaint alleges effectively nothing about either of those two groups.

Kietzman never alleges that any particular radiologist or urologist entered into a particular agreement with particular Hospital staff to undertake a particular fraudulent act. As to the radiologists in general, the only allegations appearing in the complaint are that they were "sensitive," SAC ¶ 58, "defensive," *id.*, or "touchy," *id.* ¶ 63, about billing concerns. That is a far cry from a particularized allegation of an agreement to defraud the government. As to the urologists' involvements or intentions in general, the complaint alleges only that they "desired" that the Hospital "begin" purchasing fiducial markers for the urologists. SAC ¶ 47. (The complaint even appears to contradict itself on this point in the next sentence, which alleges that the Hospital "paid" for the fiducial markers. *Id.*) And the only allegation as to the legality of what the urologists "desired" the Hospital

"begin" doing was that it presented "no compliance concerns." *Id.* Kietzman's conspiracy claim therefore fails on these grounds as well.

## III. Retaliatory Termination, FCA (Count IV)

The FCA provides a remedy, as relevant here, to any employee who is discharged "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). A plaintiff establishes her entitlement to the remedy by showing that (1) her actions were protected activity under the FCA, (2) her employer had knowledge that she was engaged in the protected activity, and (3) there was a causal link between the protected activity and the discharge.[7] *Fanslow v. Chi. Mfg. Center, Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

As for the first element, Section 3730(h)

> protects two categories of conduct. The statute has long
> prevented employers from terminating employment for
> conduct that is 'in furtherance of an action under [the FCA].'

---

[7] The Seventh Circuit has allowed an FCA retaliation plaintiff to proceed on a showing of mixed-motive discharge, that is, by showing that her "discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chi. Mfg. Center, Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). (This is the causation standard cited by Kietzman; Bethany Circle cites no standard.) But the Supreme Court's declaration that "because of" denotes but-for causation in analogous antiretaliation and antidiscrimination contexts, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (Title VII retaliation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (ADEA discrimination), calls the viability of mixed-motive cases under the FCA into serious doubt. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) ("[*Gross*] suggests that when another anti-discrimination statute [contains "because of" language and] lacks [language expressly recognizing mixed-motive claims], a mixed-motive claim will not be viable under that statute."); *United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973, 984–85 (N.D. Ill. 2015) (citing *Gross*, *Nassar*, and *Serwatka*, holding FCA retaliation requires but-for causation). *But see United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 715 (7th Cir. 2014) (citing *Fanslow*, reciting mixed-motive standard in FCA case). As neither the Seventh Circuit, nor the parties here, have squarely addressed this question as applied to the FCA, and because the answer will not be dispositive of our ruling on the instant motion to dismiss, we do not address it further.

> In *Brandon* [*v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d
> 936 (7th Cir. 2002)], [the Seventh Circuit] explained that this
> language reached conduct that put an employer on notice of
> potential False Claims Act litigation. In 2009, Congress
> amended the statute to protect employees from being fired for
> undertaking 'other efforts to stop' violations of the Act, such
> as reporting suspected misconduct to internal supervisors.

*Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012) (original

alterations, citation, quotations omitted).

Bethany Circle errs in maintaining (as its sole argument for dismissal) that an FCA

retaliation claim is derivative of and necessarily depends on a proved or provable

underlying FCA violation.[8] *See United States ex rel. Grenadyor v. Ukrainian Vill.*

*Pharmacy*, 772 F.3d 1102, 1109 (7th Cir. 2014) (affirming dismissal with prejudice of

FCA fraud claims, reversing dismissal of FCA retaliation claim). Rather, the question is

whether "(1) the employee in good faith believes, and (2) a reasonable employee in the

same or similar circumstances might believe, that the employer is committing fraud

against the government." *Fanslow*, 384 F.3d at 480 (quoting *Moore v. Cal. Inst. of Tech.*

*Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)).

---

[8] Kietzman appears to mistake Bethany Circle's argument on this point for a different argument, which it has not made, relating to how imminent FCA *qui tam* litigation must be before the Act's antiretaliation provision is triggered, a question which, as Kietzman correctly though irrelevantly points out, is of diminished importance following the 2009 "other efforts" amendment to the FCA. *See United States ex rel. Helfer v. Assoc. Anesth's of Springfield, Ltd.*, No. 10-3076, 2014 WL 4198199, at *6–7 (C.D. Ill. Aug. 25, 2014) (citing *Halasa*, noting *Brandon*'s "distinct possibility" of litigation standard too narrow to account for 2009 "other efforts" amendment; citing *Fanslow*, noting Seventh Circuit "seemed to retreat" from *Brandon*'s "high bar" even before 2009).

A retaliation plaintiff "need not be able to prove fraud on the merits[,]" *Abner v. Jewish Hosp. Healthcare Servs., Inc.*, No. 4:05-cv-106, 2008 WL 3853361, at *8 (S.D. Ind. Aug. 13, 2008) (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 864–65 (7th Cir. 1994)), and "may proceed under [Section 3730(h)] independently of a *qui tam* action." *Fanslow*, 384 F.3d at 479 (citing *Neal*, 33 F.3d at 865). "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together. The statute does not, however, protect an employee who just imagines fraud without proof." *Id.* at 481 (citations omitted). The employee may not "play[] the part of Chicken Little[,] . . . imagin[ing] fraud but lack[ing] any objective basis for that belief[.]" *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006).

Bethany Circle cites two district court cases which it reads to require an underlying FCA violation before an FCA retaliation claim may proceed. *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 828 (N.D. Ill. 2016) ("Because Singer has failed to state [an FCA fraud claim], his FCA retaliation claim fails as well.") (citing *United States ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-cv-1392, 2014 WL 378644 (C.D. Ill. Feb. 3, 2014) ("Without finding that the Plaintiff has sufficiently pled the claims for reimbursement were fraudulent or ever presented to the government, the Court cannot conclude that the allegations support a finding that Plaintiff was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.")). *McGinnis* neither cited nor purported to establish a rule that an FCA retaliation claim may proceed only to the extent of an FCA fraud claim; it held simply that the

complaint at bar did not state a plausible claim of retaliation. *Singer* appears to treat the conclusion in *McGinnis* as flowing from a rule of law, but cites no other authority for such a rule. With due consideration, we decline to follow that court's *ipse dixit* as contrary to circuit authority. *Grenadyor*, 772 F.3d at 1109; *Fanslow*, 384 F.3d at 480.

Here, Kietzman stands on firmer ground in the friendlier environs of Rule 8. As for the first element of a retaliation claim, the employee's protected activity, Kietzman's subjective good faith in believing that the Hospital was fraudulently billing Medicare in connection with the radiological scans plausibly appears from her efforts to raise the issue with Hospital management and is not undermined by any other allegation in the complaint. Moreover, Kietzman plausibly alleges that a reasonable employee in the same or similar circumstances might have believed the same when she alleges that several hospitals in the Hospital's "risk retention group" stated that such billing was "illegal, improper, and against CMS rules and regulations[,]" SAC ¶ 28, as well as similar suspicions being voiced by Meyer and, apparently, Siemens medical-equipment trainers. *See id.* ¶ 36.

It is a much closer question, however, as to whether Kietzman actually *undertook* any "other efforts to stop" what she reasonably and in good faith believed to be an FCA violation. 31 U.S.C. § 3730(h)(1). She does allege that she told Morgan she was "considering reporting the matter [of the radiology billing] to the federal government[,]" SAC ¶ 61, and that she told Dozier that, "if the [fraudulent radiology] billing were occurring, she would need to report it to the federal government." *Id.* ¶ 63. In view of *Halasa*'s admonition that "reporting suspected misconduct to internal supervisors" may

constitute protected activity, 690 F.3d at 847–48, *see also United States ex rel. Helfer v. Assoc. Anesth's of Springfield, Ltd.*, No. 10-3076, 2014 WL 4198199, at *7 (C.D. Ill. Aug. 25, 2014) (plaintiff "reported his findings and concerns about [defendant's] noncompliance [to] his superiors . . . ."); *McGinnis*, 2014 WL 378644, at *12 (plaintiff's complaints to superiors that claim submission "would be fraud" "could plausibly be read to constitute 'efforts to stop'" FCA violations), and in view of the fact that Kietzman's statements related directly to fraud on the government, *compare United States ex rel. Robinson v. Ind. Univ. Health Inc.*, No. 1:13-cv-2009, 2016 WL 10567964, at *15 (S.D. Ind. Mar. 30, 2016) ("These complaints . . . relate to patient care and medical practices, not fraud on the government to obtain Medicaid payments."), and in view finally of the absence of any contrary argument from Bethany Circle, we conclude that Kietzman's statements suffice to plausibly allege protected activity at the motion to dismiss stage.

As to the second element, there is no question that Dozier and Morgan were aware of Kietzman's protected activity, as Kietzman's statements were made directly to them.

As to the third element, again in the absence of any contrary argument from Bethany Circle, we find Kietzman's allegations sufficient to raise a plausible inference of a causal link between her protected activity and her firing. Indeed, Dozier flatly told Meyer in Kietzman's presence that Dozier "would not tolerate anyone" who reported or threatened to report the Hospital's practices to the government. SAC ¶ 41. Kietzman had received only "exemplary" performance reviews prior to her termination, *id.* ¶ 8, and none of the concerns about her performance stated in her October 2, 2015, termination letter had apparently been voiced before, raising a plausible inference of pretext. Further

raising such inference is the temporal proximity between Kietzman's September 15, 2015, e-mail on the Hospital's billing policy with respect to the radiological scans, and her October 5, 2015, firing. Finally, drawing (as we must) all reasonable inferences in Kietzman's favor, Dozier's reaction to Kietzman's September 15, 2015, e-mail (which merely communicated what Kietzman, relying on Dozier's own prior statements, understood to be an accurate statement of the Hospital's billing practice), was suspiciously overreactive. *See id.* ¶ 58 ("Why would you copy all these people on this question? This is unprofessional.").

Accordingly, for the reasons above, we conclude that Kietzman has plausibly alleged that she was fired by Dozier from the Hospital in retaliation for voicing her concerns about the Hospital's billing with respect to the radiological scans in the Cancer Center.

## IV.  Wrongful Termination, Indiana Law (Count III)

Kietzman includes in her complaint a cause of action under Indiana law for wrongful discharge. Bethany Circle's only rejoinder is that we should decline to exercise supplemental jurisdiction over the state-law claim where all the federal claims have failed. But, as we have explained, Kietzman's FCA retaliation claim survives. Having forfeited further arguments for dismissal by failing to raise them, *United States ex rel. Rockey v. Ear Inst. of Chi., LLC*, 92 F. Supp. 3d 804, 826 (N.D. Ill. 2015) (citing *G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012)), Bethany Circle is not entitled to dismissal of any state-law claim. We do not address at this stage whether, or to what extent, this state-law claim may be duplicative of the federal retaliation claim.

**Conclusion**

For the reasons above, Bethany Circle's motion to dismiss is GRANTED with respect to Counts I and II of Kietzman's second amended complaint. Those claims are DISMISSED WITHOUT PREJUDICE, but without permission to amend her complaint a third time as of right. *See* Dkt. 64, at 3 ("[A] district court ordinarily should allow a plaintiff one opportunity to amend her complaint after a dismissal under Rule 12(b)(6). By permitting Ms. Kietzman pre-emptively to amend her complaint, the court is in essence allowing her that opportunity now instead of later." (citation omitted)). Kietzman may seek such leave in the ordinary course, which will be granted only on a clear showing that the above-recited deficiencies with respect to the fraud claims have been cured.

Bethany Circle's motion to dismiss is DENIED with respect to Counts III and IV of Kietzman's second amended complaint.

IT IS SO ORDERED.

Date:    3/30/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew S. Arend
DINSMORE & SHOHL LLP
matthew.arend@dinsmore.com

Thomas B. Bruns
BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC
tbruns@bcvalaw.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC
ad@bdlegal.com

Michael W. Hawkins
DINSMORE & SHOHL LLP
michael.hawkins@dinsmore.com

Jennifer Orr Mitchell
DINSMORE & SHOHL LLP
jennifer.mitchell@dinsmore.com

Rodney Lee Scott
WATERS, TYLER, HOFMANN & SCOTT, LLC
rscott@wthslaw.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov